UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

Case Number:

NICOLE OFSOWITZ LUCAS,

     Plaintiff,

vs.

CITY OF Delray Beach, a Florida
municipal corporation; JAVARO A.
SIMS, individually; ANTHONY
MARTINEZ, individually, and
SCOTT PRIVITERA, individually,

     Defendants.

_____/

## Complaint for Damages and Injunctive Relief

### Count I: Nicole Ofsowitz Lucas's Claim Under 42 U.S.C. § 1983 for Violation of her First Amendment Right to Free Speech

Plaintiff, Nicole Ofsowitz Lucas, sues defendants, City of Delray Beach,

Javaro A. Sims, Anthony Martinez and Scott Privitera, and alleges:

### Introduction and Summary

1.    This is an action by Nicole Lucas, a white, female member of the

City of Delray Beach Police Department's Vice, Intelligence and Narcotics

("VIN") Unit.

    a.    Agent Lucas's 15-year personnel file brims over with

commendations and positive reviews.  She, on June 2, 2020. posted a



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

criticism of the Black Lives Matter movement on her personal, private Facebook page that is accessible solely to friends and family.  Javaro A. Sims, the City's first black police chief, was given — by whom, he has refused to say — a screen shot of Agent Lucas's post June 4; he put her on administrative leave the next day, and he kept her off-duty for three months to "let her stew."

      b.     Chief Sims subsequently gave Agent Lucas a written warning — but only after it was made clear to the City by her lawyer that if Chief Sims gave her the three-day suspension he had announced plans to impose, both he and the City would be sued.  The explicit rationale for opposing the three-day suspension was not only that it would have violated Agent Lucas's First-Amendment rights, but that it also would have disqualified Agent Lucas from beginning in January 2021 a four-year assignment as part of a Drug Enforcement Administration task force.

      c.     However, once Chief Sims put the written-warning in Agent Lucas's file, along with a notation that he had sustained an allegation that her comments about Black Lives Matter had violated the police department's rule on "Professional Conduct," the City weaponized the written-warning to accomplish the same disqualification.

      d.     Two lieutenants, Anthony Martinez, her VIN supervisor, and Scott Privitera, who was in charge of Internal Affairs, made sure that the Black Lives Matter file, including a copy of the letter from Agent Lucas's lawyer, was sent to the DEA.

e.     The DEA's West Palm Beach supervisor, at that point, said the DEA no longer wished to have Agent Lucas on the task force; she was replaced by the only other person available to do so, a male agent with substantially less experience — and an open citizen's complaint at the time of his appointment, which was not revealed to the DEA.

f.     Contemporaneously, the City reassigned Agent Lucas's husband, Mark Lucas, a VIN agent with 22 years narcotics experience, including during the past two years working in the same unit with Agent Lucas.

g.     Agent Lucas seeks money damages, injunctive relief, attorney's fees and litigation expenses and any other available remedies against the City of Delray Beach, Javaro A. Sims, Anthony Martinez and Scott Privitera.

## Jurisdiction and Venue

2.     These claims arise under the free-speech clause of the First Amendment to the United States Constitution, as extended to the States by the Fourteenth Amendment; the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3.     The claims being sued upon arose in Palm Beach County, Florida, where the defendants at all material times resided or did business.

## Parties

4.      Nicole Lucas is, and at all times material was, a City of Delray Beach police officer.

5.      Defendant City of Delray Beach is, and at all times material was, a Florida municipal corporation that operated towards Agent Lucas under color of state law.

6.      Defendant Javaro A. Sims, whom Agent Lucas sues in his individual capacity, was at all times material the police chief of the City of Delray Beach and, as such:

      a.      has acted towards Agent Lucas pursuant to the authority bestowed upon him by the City of Delray Beach and under color of state law;

      b.      was the decision-maker in keeping Agent Lucas on administrative leave for three months; threatening her with a three-day suspension, and issuing a written warning that became part of her permanent file;

      c.      was the City of Delray Beach's final policy-maker concerning each of those acts because there is no meaningful review of his actions available within city government to Agent Lucas;

      d.      either expressly authorized the release of the internal-affairs report to the DEA by two lieutenants and the reassignment of her husband, Mark Lucas, away from the same unit where they had worked together for the past two years, or established an unofficial policy or custom of retaliation for Agent Lucas's protected speech — through the proclamation

to Lieutenant Privitera of his intention to let Agent Lucas "stew" during a three-month administrative leave, and his announcement of a plan to impose a three-day suspension based on the content of Agent Lucas's speech, and

      e.     has created since his promotion to chief of police an unofficial policy or custom of discrimination against white women by immediately demanding that the City terminate Mary Olsen, the white, female assistant chief of operations; passing over two qualified white females for promotions and imposing on one of those two white females a 24-hour suspension arising out of an internal-affairs investigation that was not concluded within the 180-day period mandated by the Law Enforcement Officers's Bill of Rights.

      7.     Anthony Martinez, whom Agent Lucas sues in his individual capacity:

      a.     is a lieutenant of police at the City of Delray Beach;

      b.     was in command of the VIN unit at the time that Agent Lucas was placed on administrative leave and subsequently given the written warning;

      c.     was in contact with the ranking agent at the DEA's West Palm Beach office concerning Agent Lucas's proposed appointment to the DEA task force, and

d.      has at all times material acted towards Agent Lucas pursuant to the authority bestowed upon him by the City of Delray Beach and under color of state law.

8.      Scott Privitera, whom Agent Lucas sues in his individual capacity:

a.      is a lieutenant of police at the City of Delray Beach who was in command of the Internal Affairs unit at the time that Agent Lucas's comments about Black Lives Matter were investigated;

b.      forwarded the internal-affairs investigative file concerning Agent Lucas's Black Lives Matter criticism — and her lawyer's threat to sue — to the DEA's West Palm Beach office, and

c.      has at all times material acted towards Agent Lucas pursuant to the authority bestowed upon him by the City of Delray Beach and under color of state law.

**General Allegations as Relates to Count I**

9.      Agent Lucas posted the following at 6:05 p.m. June 2 on her personal, private (i.e., friends-and-family only) Facebook page:

> Fuck everyone who says black lives matter. I can't take your fucking bullshit anymore. ALL LIVES MATTER!  BLM encourages racial divide, violence and hate. Look at all the officers killed and injured for trying to protect people & property they don't even know. Officers are being killed EVERY FUCKING day & now even more so (sic) and no one riots or wears shirts that say POLICE LIVES MATTER. If you don't agree with my feelings PLEASE do not comment. If you don't like me now then just unfriend me. But know ALL LIVES MATTER TO ME, AND I GO ABOVE AND BEYOND TO HELP ALL PEOPLE.

10.     The page does not identify Agent Lucas as a Delray Beach police officer; she was off duty when she posted the comment from her private cell phone.

11.     The sentiment that she articulated towards Black Lives Matter is obviously contrary to that publicly expressed by Chief Sims, who at a Black Lives Matter protest June 3 knelt next to Prince Ahmad Yusuf Arafat, f/k/a Prince C. Ferguson, a convicted armed-robber and murderer who was leading the demonstration.

12.     Agent Lucas's all-lives-matter message, however, is consonant with that of the Delray Beach Police Department's Facebook page, which includes a September 3, 2015 photograph of a mixed-race group of six police personnel, including two sergeants, holding up a Delray Beach badge and signs stating "#ALL LIVES MATTER."

13.     Someone, whose identity Chief Sims has refused to reveal, electronically sent Chief Sims a screen shot of Agent Lucas's post June 4.

14.     Chief Sims placed Agent Lucas on administrative leave the following day, which did not take away her base salary but:

     a.     required her to stay at home from 8:00 am. to 4 p.m. Monday through Friday;

     b.     required her to check in by phone twice daily and

     c.     deprived her of overtime.

15.     Chief Sims told Lt. Scott Privitera, the commander of Internal Affairs, that he was keeping her out as long as he did — even though the

internal-affairs investigation was complete and had been reviewed by Agent

Lucas's lieutenant, her captain and the deputy chief of police by June 24 —

to "let her stew."

16.     During a 28-minute internal-affairs interview June 11, Sergeant

Gary Ferreri focused not on the language that Agent Lucas used, but rather

on the substance of her objections to the Black Lives Matter movement.

17.     Sergeant Ferreri asked Agent Lucas line-by-line of her post

"what do you mean. . .," and whether she was familiar with the police

department's social media policy — which she was not accused of violating:

a.     Sergeant Ferreri's first substantive question about the post

was to ask Agent Lucas, "What is your understanding of the term, Black

Lives Matter, or the Black Lives Matter movement?," to which she

responded:

> It's my understanding that, that it is kind of part of the
> Democratic party and a way that the Democrats are creating the racial
> divide within our country and using it as their political platform to try
> to get Joe Biden elected and they are taking the money from people
> that are trying to support equality amongst all but specifically in this
> case black people and that money that's raised doesn't seem to go to
> those black people that need it.  It's a façade.

b.     In response to a question about what she meant in stating

"Fuck everyone who says black lives matter. I can't take your fucking

bullshit anymore. ALL LIVES MATTER!," Agent Lucas responded:

> I was extremely overwhelmed ever since this started when a
> police officer decided to make a choice that is now reflected upon all of
> us throughout the whole country, everybody that wears a badge and
> now we're all pieces of shit apparently and everywhere I turned, it
> says Black Lives Matter and that hurts me because all of us matter. I

can't even turn on my Amazon TV without having it shoved in my face. My freaking TV says, Black Lives Matter, we stand in solidarity with the Black community. Well, why don't you stand in solidarity with all the police officers that risk their life every day? And all the families who have lost a police officer killed in the line of duty? Why is nobody standing with us? So I had been ignoring it, ignoring it, ignoring it, and then when I saw that list of all the officers that were killed or injured because one police officer made one bad decision that pushed me over the edge and I was very emotionally overwhelmed and I posted that to my, what I thought was my friends and family. I have no idea who would take my personal feelings when I pretty much reaching out for support and then try to get me in trouble for it. Everybody's entitled to their own opinion and that was my opinion, and if you didn't, if that person didn't like it, like I don't like a crapload of stuff that I'm seeing, I scroll, I don't go on social media. I don't turn on the news, but I certainly don't put down other people for what they believe and what they value

   c.     When asked what she meant by stating that "Black Lives

Matter, BLM, encourages racial divide, violence and hate," she responded:

"That's my opinion based on what I'm seeing, which I can't avoid, is the

looting, the rioting, people being killed for trying to protect their storefronts

and their businesses. That's what I see all over the news. All I see is violence

and, and criminal behavior."

   d.     Asked to explain what she meant when she stated "Look at

all the officers killed and injured for trying to protect people & property they

don't even know. Officers are being killed EVERY FUCKING day & now even

more so (sic) and no one riots or wears shirts that say POLICE LIVES

MATTER," she answered:

   I just don't understand why people don't support law enforcement. To me, the facts are that, and I can't tell you like the numbers right now off the top of my head, but of the millions of police contacts every year, it is a really small percentage of people that are injured or killed and, and by an officer and, I'm sorry, can you say the question again? . . .

That's pretty much exactly. . .  I mean we are literally risking our lives every single day. Some people don't get to go home to their children at night because they were killed by somebody and nobody's standing up and saying, enough is enough, you're not going to kill a police officer. You're not going to hurt a police officer. You're not going to spit on them, kick them, throw rocks, piss on them and all the other bad stuff that they do to us anymore. I don't understand why no one stands up and says that.

18.    Although Sgt. Ferreri questioned Agent Lucas about her

familiarity with the department's social media policy, she was not found

guilty of violating that policy, but rather of violating Item 30 ("Professional

Conduct") of the Delray Beach Police Department Rules and Regulations

Governing Ethical Behavior of Employees and Volunteers:

Employees and volunteers shall not commit any specific act or acts of immoral, improper, disorderly or intemperate personal conduct which reflects discredit upon the employee or volunteer, upon fellow employees or volunteers, or upon the Department.  Employees and volunteers who become involved in any incident outside the workplace that could have potential criminal implications or bring discredit upon themselves and or the Delray Beach Police Department shall immediately notify the on-duty shift commander or their supervisor. . . .

19.    Further evidence of the police department's content-based

objections to Agent Lucas's posted opinions about the Black Lives Matter

movement was supplied by Assistant Chief Gene Sapino.  He recommended

June 24 that she given a three-day suspension rather than the written

warning recommended by her lieutenant and her captain because —

notwithstanding that there was no evidence produced by the internal-affairs

investigation that the opinion was circulated to anyone other than those

persons on her family-and-friends-only Facebook page — her opinion "is

divisive and creates a separation between the police department and the community we serve."

20.     Agent Lucas's comments on Black Lives Matter, however, were speech protected by the First Amendment:

a.      Although Agent Lucas commented on the dangers facing law enforcement officers across the nation in the wake of the death of George Floyd, her comments had nothing to do with her job as an VIN agent;

b.      comments on the Black Lives Matter movement, support of which Agent Lucas ascribed to the Democratic Party, as well as on the protests that were occurring throughout the nation in June, and on the deaths and injuries of law enforcement officers, related instead to political, social and other concerns, and

c.      Agent Lucas's interest in expressing her feelings about Black Lives Matter to her friends and family on a private Facebook page — as opposed to more widely circulated social media — outweighs the City's interest in prohibiting such a private expression of political and social beliefs because:

i.      such private speech does not impede the City of Delray Beach Police Department's ability to perform its duties efficiently;

ii.     Agent Lucas engaged in the speech when off duty, using her private phone, using no racial slurs and directing her remarks only to her family and friends, and

iii.     the context of the speech was the private bemoaning of the racial divisiveness, and the injuries to police officers, that occurred in the wake of George Floyd's death.

21.     Notwithstanding the protected nature of Agent Lucas's criticism of Black Lives Matter, which she testified in her internal-affairs interview that she believed was a racially divisive vehicle being used by the Democratic Party to assist the presidential campaign of now-President Joseph Biden, see ¶ 17(a), Chief Sims:

a.     Sustained on September 25 a violation of Rule 30;

b.     Issued a written reprimand, which was delivered September 29 and became part of her permanent record, for having made a social-media posting "that included comments that have the potential to become incendiary";

c.     Warned her as part of that written warning that "any future violations" could result in "more severe discipline, up to and possibly including termination."

22.     Lieutenant Anthony Martinzez, who was in command of the VIN unit, attempted to obtain a complete copy of the Black Lives Matters file, but was unable to do so because the lieutenant in Internal Affairs, Scott Privitera, had not officially closed the investigation.

23.     Lt. Privitera closed the investigation and forwarded the file November 13 to Ian L. McVane, the DEA agent in charge of the West Palm Beach office, who by that time had known to ask for a copy.

24.     Following what appears to have been a telephone conversation between Lieutenant Martinez and DEA Agent McVane — based on a 5:09 p.m. November 23 text message from Lieutenant Martinez to Agent McVane, "Would you send me an email regarding your position in reference to agent (sic) Lucas.  We understand your concerns and I will notify her tomorrow" — Agent McVane sent a 5:11 p.m. e-mail to Lt. Martinez stating:  "After a thorough review of the Internal Affairs investigation for Agent Nicole Lucas, the DEA West Palm Beach District Office would like to respectively pursue another Delray Beach Police Department candidate for the available Task Force position."

25.     The Delray Beach Police sent as Agent Lucas's replacement Barry Kopplin, a male agent with significantly less narcotics experience than Agent Lucas:

        a.      who at the time of his selection for the DEA task force had an open citizen's complaint based on his interaction with a female civilian, but

        b.      whose internal affairs history was not pulled and forwarded to the DEA, as Lieutenant Martinez and Privitera had done with Agent Lucas's.

26.     Agent Lucas's being pulled from the DEA assignment not only deprived her of a high point in her 15-year law enforcement career, but because of the overtime associated with working on the DEA task force, will cost her a substantial amount of lost wages over the next four years.

27.     At the same time as Agent Lucas was being told that she would not be going to DEA, her husband, Mark Lucas, who has 22 years of VIN experience, the most recent being two years working alongside his wife, was informed he was being transferred to road patrol.

28.     As a direct, natural and proximate result of defendants' actions towards Agent Lucas, Agent Lucas has suffered damages, including but not limited to:

        a.     lost earnings;

        b.     diminishment of earning capacity; and

        c.     emotional distress and mental anguish.

29.     Chief Sims, Lieutenant Martinez and Lieutenant Privitera each exhibited wilful disregard of Agent Lucas's clearly established First-Amendment rights to free speech, entitling her to recover punitive damages against each of them.

30.     If not enjoined by this Court to cease its burdening of Agent Lucas's constitutional right to free speech, the City of Delray Beach and the individual defendants would continue to punish her for having engaged in protected speech by criticizing the Black Lives Matters movement.

31.     Plaintiff is entitled, pursuant to 42 U.S.C. § 1988, to recover her costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Nicole Ofsowitz Lucas, prays that this Court will grant judgment for her, and against defendants, City of Delray Beach, Javaro A. Sims, Anthony Martinez and Scott Privitera:

*One*, determining that the City and the individual defendants violated Agent Lucas's rights to Free Speech by placing her on administrative leave for three months, sustaining a Professional Conduct charge against her and forwarding her Black Lives Matter investigative file to the DEA to sabotage her appointment to the DEA task force;

*Two*, enjoining the City and the individual defendants, both preliminarily and permanently, to cease burdening Agent Lucas's First-Amendment rights by, <u>inter alia</u>, amending the internal-affairs investigation to show that Agent Lucas has been exonerated of any violation of Rule 30 and restoring her husband, Agent Mark Lucas, to his position in VIN;

*Three*, awarding compensatory damages against the City of Delray Beach and the individual defendants, jointly and severally, and awarding punitive damages against the individual defendants;

*Four*, awarding costs, including attorney's fees and litigation expenses, against the City of Delray Beach and the individual defendants, and

*Five*, granting such other and further relief as is just.

### Count II:  Nicole Ofsowitz Lucas's Claim Under 42 U.S.C. § 1983 for Violation of her Clearly Established Fourteenth-Amendment Right Against Sex Discrimination

32.    Plaintiff, Nicole Ofsowitz Lucas, realleges and adopts, as if fully set forth in Count II, the allegations of ¶¶ 1-9, 13-15, 21-26.

## General Allegations as Relates to Count II

33.     Since being named as Delray Beach's first black chief of police February 12, 2019, Chief Sims has established an unofficial policy or custom of discriminating against white women:

a.     Chief Sims, who generally refused to speak to Mary Olsen, a highly experienced law-enforcement manager whom Delray Beach had recruited from the West Palm Beach police department to be the assistant chief for operations and who was a mentor for other women on the department:

i.     immediately transferred Assistant Chief Olsen from Operations to Support upon taking over from her as Interim Police Chief as they both essentially auditioned for three months each to succeed retiring Chief Jeff Goldman;

ii.     replaced her with a male lieutenant, Gene Sapino;

iii.     announced the reorganization, which had not been previously discussed, by leaving a revised organizational chart in a folder on her desk with a Post-it note that read:  "We can discuss upon your return to the office.  I have a dentist appointment @ 10:30 and you are not in the office.  Sims," and

iv.     demanded as soon as he because chief that City Manager Mark Lauzier fire her — because, as Assistant Chief Olsen quotes Mr. Lauzier as explaining, she "was not part of [his] team";

b.      Chief Sims has twice passed over for promotion to captain Lieutenant Nicole Guerriero a 21-year Delray Beach police officer and five-year lieutenant, the more recent pass-over having been in favor of a black male who had only been on the department 14 years and had been a lieutenant only three years;

c.      Chief Sims, immediately after taking over as chief, removed Lieutenant Guerriero from supervising Internal Affairs, reassigning her to road patrol and replacing her with Lieutenant Privitera, and

d.      Chief Sims suspended Lieutenant Guerriero for 24-hours in December 2020 based on an internal-affairs investigation that not only was overall non-compliant with the procedures promised to law enforcement officers, but that Lieutenant Privitera had permitted to languish more than the 180 beyond which § 112.532(6)(a), FLA. STAT., mandates that no discipline can be imposed — of which tardiness Chief Sims was aware at the time he imposed the suspension.

e.      Chief Sims has repeatedly passed over for promotion to sergeant Master Officer Stephanie Benavidez Baker, a 15-year veteran of the department:

i.      Master Officer Baker was the only candidate on the 2020-2021 promotional list to hold that advanced rank;

ii.      She was ranked second of all the candidates by a six-person panel that scored each from 0 to 3 based on their answers to interview questions;

      iii.     Master Officer Baker was passed over in favor of Caribbean-American woman who scored 18, and was promoted second, and by five males of varying ethnicities who scored, in order of promotion, 14, 16, 16, 15 and 12, and a white woman who was promoted fifth with a score of 13.

34.    Chief Sims was made aware through Agent Lucas's lawyer's letter to City Attorney Lynn DeSanti Gelin that white personnel of the police department, both law enforcement officers and civilians, had posted — during the same time frame as Agent Lucas's Black Lives Matter comments — racially tinged threats of violence and retribution against persons protesting George Floyd's death, e.g.:

      a.     "Y'all rioting, hollering "Fu*k America!  Let's cut them monthly checks, and EBT cards off, and y'all can hate American for free! #FUback";

      b.     "Anyone arrested for looting, damaging property or committing violence towards police should be banned from any government assistance including stimulus money and unemployment benefits, food stamps or any other financial aid for life," and

      c.     "So rioters you say country boys are next.  You do realize country boys will sit 30 feet up a tree all day just to kill something.. (Sic)"

35.    Even after being so advised in the letter to City Attorney Gelin, however, Chief Sims and the City of Delray Beach did nothing to try to track down the male police-department employees responsible for those posts.

36.     Chief Sims, who sustained the Professional Conduct allegation, and Lieutenants Martinez and Privitera, who communicated the results of the Black Lives Matter investigation to the DEA, were all aware that if Agent Lucas did not get the assignment to the DEA task force, the only person that would be left for that job was a male, Barry Kopplin, who was substantially less qualified.

37.     Lieutenants Martinez and Privitera's communications with the supervisor of the DEA's West Palm Beach office about the internal-affairs investigation of Agent Lucas's Black Lives Matters comments — and about her lawyer's threat to sue Chief Sims and the City if Chief Sims imposed his desired 24-hour suspension — obviously was the type of information that could (and did) make Agent Lucas unattractive as a prospective task force member, notwithstanding her exemplary 15-year record as a Delray Beach police officer and her success as a VIN agent.

38.     As a direct, natural and proximate result of the City's furnishing the DEA with the internal-affairs file on Agent Lucas — while not similarly sharing any similar information about Agent Kopplin — Agent Kopplin replaced Agent Lucas as Delray Beach's member of the DEA task force.

39.     The sabotage of Agent Lucas's secondment to the DEA task force was because of her sex, i.e., an outgrowth of the custom and policy of discriminating against white women that Chief Sims has instilled in the Delray Beach Police Department since becoming chief through repeated incidents of gender discrimination, as more particularly alleged in ¶¶ 33(a)-

(e), that were immune from meaningful review by the City Manager or through arbitration.

40.    As a direct, natural and proximate result of defendants' actions towards Agent Lucas, Agent Lucas has suffered damages, including but not limited to:

      a.    lost earnings;

      b.    diminishment of earning capacity; and

      c.    emotional distress and mental anguish.

41.    Chief Sims, Lieutenant Martinez and Lieutenant Privitera each exhibited wilful disregard of Agent Lucas's clearly established Fourteenth-Amendment right to equal protection, i.e., against sex discrimination, entitling her to recover punitive damages against each of them.

42.    If not enjoined by this Court to cease its deprivation of Agent Lucas's constitutional right to equal protection, the City of Delray Beach and the individual defendants would continue to discriminate against her because of her sex.

43.    Plaintiff is entitled, pursuant to 42 U.S.C. § 1988, to recover her costs and litigation expenses, including a reasonable attorney's fee, for bringing this action.

WHEREFORE, Plaintiff, Nicole Ofsowitz Lucas, prays that this Court will grant judgment for her, and against defendants, City of Delray Beach, Javaro A. Sims, Anthony Martinez and Scott Privitera:

*One*, determining that the City and the individual defendants violated Agent Lucas's clearly established right to equal protection, i.e., to be free from sex discrimination, by sustaining a Professional Conduct charge against her and forwarding her internal-affairs file to the DEA, thereby sabotaging her appointment to the DEA task force;

*Two*, enjoining the City and the individual defendants, both preliminarily and permanently, to cease discriminating against Agent Lucas because of her sex by, inter alia, amending the internal-affairs investigation to show that Agent Lucas has been exonerated of any violation of Rule 30, sending the amended file to the DEA and replacing Agent Koplin with Agent Lucas as Delray Beach's member of the DEA task force;

*Three*, awarding compensatory damages against the City of Delray Beach and the individual defendants, jointly and severally, and awarding punitive damages against the individual defendants;

*Four*, awarding costs, including attorney's fees and litigation expenses, against the City of Delray Beach and the individual defendants, and

*Five*, granting such other and further relief as is just.

Respectfully Submitted,

*/s/ Karen Coolman Amlong*
KAmlong@TheAmlongFirm.com
The Amlong Firm
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983
**Attorneys for the Plaintiff,**
 **Nicole Lucas**