UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-80469-ALTMAN/Matthewman

NICOLE OFSOWITZ LUCAS,

> *Plaintiff,*

*v.*

CITY OF DELRAY BEACH, *a Florida
Municipal Corporation,*

> *Defendant.*

_____/

## ORDER ON SUMMARY JUDGMENT

On June 2, 2020, our Plaintiff, Nicole Lucas, an officer with the City of Delray Beach Police Department published an expletive-laden rant about Black Lives Matter on her Facebook page and invited anyone who disagreed with her to "unfriend" her. After several members of the public brought Lucas's angry post to the attention of the Police Department, Javaro Sims (the City's Police Chief) initiated disciplinary proceedings against her—at the end of which the Police Department issued her a written reprimand. Lucas now claims that this reprimand cost her a chance to serve as an undercover agent for the DEA.

Under an agreement the Police Department had signed with the DEA, the Department could recommend one of its officers for a detail assignment on a DEA task force. Of course, the DEA—not the Police Department—had the final say over any applicant. When she wrote the incendiary post at issue here, Lucas *was* being considered for that special assignment. But, after it asked for a copy of Lucas's internal-affairs file, the DEA passed her over. Seeing the Police Department's hand in this decision, Lucas sued our Defendant—the City of Delray Beach—alleging one count of First Amendment retaliation under 42 U.S.C. § 1983 (Count I) and one count of sex discrimination, also

under § 1983 (Count II). After we denied the City's motion to dismiss, the parties engaged in substantial discovery and have now asked us to resolve this case at summary judgment. While Lucas has moved for summary judgment *only* on her First Amendment claim, *see generally* Plaintiff's Rule 56 Motion for Partial Summary Judgment ("Lucas's MSJ") [ECF No. 96], the City asks for judgment on both counts, *see generally* Defendant's Motion for Summary Judgment ("City's MSJ") [ECF No. 97]. Having carefully reviewed the parties' briefs,[1] the record, and the governing law, we now **GRANT** the City's MSJ and **DENY** Lucas's MSJ.

## THE FACTS[2]

By June of 2020, Nicole Ofsowitz Lucas had been "an undercover narcotics agent" in the Delray Beach Police Department's "Vice, Intelligence[,] and Narcotics Unit since 2017 or 2018[.]" Plaintiff's Local Rule 56.1(a) Statement of Material Facts in Support of Motion for Summary Judgment ("Lucas's SOF") [ECF No. 95] ¶ 2 (citing Dec. 15, 2021 Deposition of Nicole Ofsowitz Lucas ("Lucas Dec. Dep.") [ECF No. 98-3] at 22:16–18); *see also* Defendant's Response to Plaintiff's Statement of Material Facts ("City's Response SOF") [ECF No. 101] ¶ 2 ("Undisputed."). In those days, the City had a standing agreement with the DEA, under which the City would "detail one experienced officer

---

[1] Both motions are fully briefed and ripe for adjudication. *See* Defendant's Response to the Plaintiff's Motion for Summary Judgment ("City's Response MSJ") [ECF No. 100]; Plaintiff's Response to the Defendant's Motion for Summary Judgment ("Lucas's Response MSJ") [ECF No. 108]; Plaintiff's Reply to the Defendant's Response re: Plaintiff's Motion for Summary Judgment ("Lucas's Reply MSJ") [ECF No. 115]; Defendant's Reply in Support of its Motion for Summary Judgment ("City's Reply SOF") [ECF No. 122].

[2] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)).

[from the Police Department] to the DEA West Palm Beach Task Force for minimum two-year periods, during which time the officer is [ ] under the direct supervision and control of DEA supervisory personnel assigned to Task Force." City's Statement of Material Facts ("City's SOF") [ECF No. 98] ¶ 65 (citing the Program-Funded State and Local Task Force Agreement [ECF No. 98-19] at 1); *see also* Plaintiff's Amended Response to the Defendant's Statement of Material Facts in Support of the Motion for Summary Judgment ("Lucas's Response SOF") [ECF No. 105] ¶ 65 ("Not disputed, but not relevant to summary judgment.").[3] But the decision to accept an officer into the Task Force has always been reserved to the "DEA's discretion." City's SOF ¶ 66; *see also* Lucas's SOF ¶ 66 ("Not disputed[.]").

At the same time, the City is "responsible for establishing the salary and benefits, including overtime, of the officers assigned to the Task Force[.]" City's SOF ¶ 67; *see also* Lucas's SOF ¶ 67 ("Not Disputed[.]"). And the City "does not change the salary or benefits of officers detailed to the Task Force . . . and would not have changed the salary or benefits of Lucas had she been detailed to the Task Force." City's SOF ¶ 68; *see also* Lucas's SOF ¶ 68 ("Not Disputed[.]"). The Task Force also "doesn't guarantee an officer any particular amount of overtime pay, including more overtime pay than that which the officer would ordinarily receive while not on the Task Force." City's SOF ¶ 69;

---

[3] Most of Lucas's responses to the City' SOF repeat this bizarre phrase: "Not disputed, *but not relevant to summary judgment.*" Lucas's Response SOF ¶ 65 (emphasis added). Since Lucas's legal conclusion that a fact is "not relevant to summary judgment" does nothing to dispute the asserted fact, we'll accept these facts as established. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: *citing to particular parts of materials in the record*, including depositions, documents, electronically stored information . . . [.]" (emphasis added)); *see also* S.D. FLA. L.R. 56.1(b)(2)(C) ("If an opponent's Statement of Material Facts disputes a fact in the movant's Statement of Material Facts, then the evidentiary citations supporting the opponent's position must be limited to evidence specific to that particular dispute."). And, since Lucas's caveat ("but not relevant to summary judgment") isn't at all relevant to the question of whether a properly asserted fact has been genuinely disputed, we'll omit this inapposite caveat going forward.

*see also* Lucas's SOF ¶ 69 ("See response to ¶ 68, which Ms. Lucas adopts in response to this paragraph.").[4]

On June 2, 2020, Lucas—still a police officer with Delray Beach and hoping to join the DEA Task Force—posted the following statement on her private Facebook page:

> Fuck everyone who says black lives matter. I can't take your fucking bullshit anymore. ALL LIVES MATTER! BLM encourages racial divide, violence and hate. Look at all the officers killed and injured for trying to protect people & property they don't even know. Officers are being killed every fucking day & now even more so and no one riots or wears shirts that say POLICE LIVES MATTER. If you don't agree with my feelings PLEASE do not comment. If you don't like me now then just unfriend me. But know ALL LIVES MATTER TO ME, AND I GO ABOVE AND BEYOND TO HELP ALL PEOPLE.

City's SOF ¶ 1 (quoting Facebook Post [ECF No. 98-1] at 1 (errors in original)); *see also* Lucas's SOF ¶ 1 ("Plaintiff posted the statement that the City of Delray Beach quotes in ¶ 1.").

Word of Lucas's post quickly spread. Indeed, just one day after the post was published, Javaro Sims, the Chief of the Police Department, heard about it twice. *First*, "on June 3, 2020," Chief Sims "received a copy of Lucas'[s] Facebook post in a text message from Sharon Edmonds." City's SOF ¶ 7; *see also* Lucas's Response SOF ¶ 7 ("Admitted."). Edmonds, who "became friends with [Lucas] approximately 18 years ago when Lucas was a probation officer," City's SOF ¶ 10; *see also* Lucas's Response SOF ¶ 10 ("Admitted[.]"), was also "Facebook friends with Lucas," City's SOF ¶ 11; *see also*

---

[4] Lucas's response to paragraph 68 doesn't adequately dispute *any* material fact. That response, in full, says only this: "Not disputed, but not relevant to summary judgment. However, historically Delray Beach Police Department officers assigned to the DEA task force earn substantial overtime during that assignment." Lucas's Response SOF ¶ 68. This may or may not have been a relevant fact if it had been properly supported. But it wasn't. As our quotation makes plain, Lucas has chosen, in this paragraph, not to cite a single piece of evidence at all. And, as we've said, a party must rely on *evidence* (not argument or supposition) to survive summary judgment. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: *citing to particular parts of materials in the record*, including depositions, documents, electronically stored information . . . [.]" (emphasis added)).

Lucas's Response SOF ¶ 11 ("Admitted."). "Edmonds later unfriended Lucas" on Facebook. City's SOF ¶ 12; *see also* Lucas's Response SOF ¶ 12 ("Admitted[.]").

*Second*, later that same day, at a "We Can't Breathe" rally "concerning the murder of George Floyd and police reform," City's SOF ¶ 13; *see also* Lucas's Response SOF ¶ 13 ("Admitted[.]"), "an anonymous individual approached Chief Sims and informed him of Lucas's[s] Facebook post, showing it to him on a cell phone," City's SOF ¶ 17; *see also* Lucas's Response SOF ¶ 17 ("Plaintiff objects to ¶ 17 as inadmissible hearsay." (citing *Hammond v. Hall*, 586 F.3d 1289, 1319 (11th Cir. 2009) ("Anonymous tips are not admissible into evidence to prove the truth of the matter stated in the tip."))).[5]

After reading the Facebook post, Chief Sims worried that it "was a violation of [the Police Department's] General Order 1917," Videoconference Deposition of Chief Javaro Sims ("Sims Dep.") [ECF No. 98-5] at 40:25–41:12, which prohibits employees from posting "racist, prejudice [sic], offensive, homophobic, sexist comments or hate speech," Delray Beach Police Department General Order 1917 ("General Order 1917") [ECF No. 98-14] at 3; *see also* City's SOF ¶ 18 ("Upon seeing Lucas's[s] Facebook post, Sims concluded it likely violated one or more Department

---

[5] Again, Lucas fails to dispute this point properly. The City, after all, isn't offering this quote for the truth of the matter asserted. It's simply using it (1) to highlight the state of mind of the individual in the crowd and (2) to explain how Chief Sims came to see the post for the second time. It thus *isn't* hearsay and *is* admissible at summary judgment. *See United States v. Valdes-Fiallo*, 213 F. App'x 957, 960 (11th Cir. 2007) ("Evidence that is not offered to prove the truth of the matter asserted is not hearsay." (citing FED. R. EVID. 801(c)); *see also Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1219 (S.D. Fla. 2022) (Altman, J.) ("In a half-hearted attempt to conjure up a genuine dispute, Wills contends that the anonymous tip is inadmissible hearsay . . . . *First*, the employee's anonymous complaint isn't hearsay. Hearsay is 'a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" (first quoting FED. R. EVID. 801(c); and then citing *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 910 (11th Cir. 2012) ("Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement . . . and is generally not admissible except as provided in the Rules of Evidence or a federal statute[.]"))).

policies."); Lucas's Response SOF ¶ 18 ("Not Disputed."). Chief Sims was also concerned that the post was "contrary to the Police Department's mission statement and values, and he perceived it as inflammatory, offensive, possibly racist, and likely to contribute to a hostile work environment." City's SOF ¶ 19; *see also* Lucas's Response SOF ¶ 19 ("Not disputed[.]"). Finally, Sims thought that "Lucas'[s] post could cause a ruckus and that it could undermine the Police Department's efforts to maintain trust and legitimacy in the eyes of the public." City's SOF ¶ 20; *see also* Lucas's Response SOF ¶ 20 ("Not disputed[.]").[6] Chief Sims therefore "shared the post with Assistant Chief Sapino and Lieutenant Scott Privitera (who at the time was in charge of Internal Affairs)." City's SOF ¶ 21; *see also* Lucas's Response SOF ¶ 21 ("Not disputed[.]").

Both officers found Lucas's Facebook post problematic. "Lieutenant Privitera found the post 'derogatory' and concerning, given the climate at the time." City's SOF ¶ 23 (quoting Deposition of Scott M. Privitera ("Privitera Dep.") [ECF No. 98-8] at 13:1–3); *see also* Lucas's Response SOF ¶ 23 ("Not disputed[.]"). As he put it, "'I think the opening line says it all. When she says "Fuck everyone who says black lives matter," I think that lacks sincerity. I think that's, in a sense, not a very well-thought-out thing to say, given the time when the officer was just charged with murder of George

---

[6] Lucas's responses to paragraphs 19 and 20 of the City's SOF do nothing at all. Both follow a familiar pattern: "Not disputed," paragraph 19 says, "but not relevant to summary judgment, i.e., it does not establish that it was reasonably probable to feel that Ms. Lucas's private Facebook page would be reasonably likely to 'contribute to a hostile work environment.'" Paragraph 20 is very similar: "Not disputed, but not relevant to summary judgment, i.e., it does not establish that it was reasonably probable to perceive Ms. Lucas's private Facebook page would be reasonably likely to 'cause a ruckus[.]'" Again, however, she doesn't challenge any of these factual assertions with *evidence* of her own. So, while she may be right that the post wasn't offensive, racist, homophobic, etc., she's done nothing to dispute the City's proffered fact, which is that Chief Sims *thought* the post might interfere with one or another City policy or objective. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: *citing to particular parts of materials in the record*, including depositions, documents, electronically stored information . . . [.]" (emphasis added)); *see also* S.D. FLA. L.R. 56.1(b)(2)(C) ("If an opponent's Statement of Material Facts disputes a fact in the movant's Statement of Material Facts, then the evidentiary citations supporting the opponent's position must be limited to evidence specific to that particular dispute.").

Floyd, the entire Midwest was up in arms over that.'" City's SOF ¶ 23 (quoting Privitera Dep. at 37:15–21); *see also* Lucas's Response SOF ¶ 23 ("Not disputed[.]"). And Assistant Chief Sapino worried that Lucas wouldn't make "'sound judgment decisions'" with respect to "'decisions that can ultimately end up taking someone's freedom or life, and if she can't take this bullshit anymore, that shows me there's an issue with her mental clarity.'" City's SOF ¶ 26 (quoting Deposition of Gene D. Sapino ("Sapino Dep.") [ECF No. 98-10] at 27:3–11, 45:11–13); *see also* Lucas's Response SOF ¶ 26 ("Not disputed[.]").

Agreeing that Lucas's post *might* violate the Police Department's policies, Chief Sims "instructed Lieutenant Privitera and Sergeant Ferreri to place Agent [Lucas] on administrative leave" pending an internal investigation. City's SOF ¶ 30 ("Chief Sims instructed Lieutenant Privitera and Sergeant Ferreri to place Lucas on administrative leave pending an internal investigation."); *see also* Lucas's Response SOF ¶ 30 ("Not Disputed[.]"). Pursuant to "the Internal Affairs policy," Lieutenant Privitera and Sergeant Ferreri "went to Lucas'[s] residence and notified Lucas [that] she was placed on paid administrative leave [ ] and took away her badge and gun[.]" City's SOF ¶ 31; *see also* Lucas's Response SOF ¶ 31 ("Not disputed[.]"). Notably, though, Lucas "continued to receive her full salary and benefits" during the pendency of the investigation. City's SOF ¶ 33; *see also* Lucas's Response SOF ¶ 33 ("Not disputed[.]").

At the end of the investigation, "Lieutenant Anthony Martinez and Captain Mager recommended the discipline of a written reprimand." City's SOF ¶ 41; *see also* Lucas's Response SOF ¶ 41 ("Not disputed[.]"). The written reprimand "was the only discipline the City imposed upon Lucas based on the Facebook post." City's SOF ¶ 59; *see also* Lucas's Response SOF ¶ 59 ("See response to ¶ 56, which Ms. Lucas adopts in response to this paragraph.").[7] The City never "demote[d] or

---

[7] Again, paragraph 56 says nothing salient: "Not disputed," Lucas writes here, "but not relevant to summary judgment other than to establish that Chief Sims issued Ms. Lucas a written warning because of her private Facebook post[.]" Lucas's Response SOF ¶ 56 (emphasis in original).

terminate[d] Lucas." City's SOF ¶ 61; *see also* Lucas's Response SOF ¶ 61 ("Not disputed[.]"). It also never "reduce[d] Lucas'[s] salary or benefits or any other term or conditions of her employment." City's SOF ¶ 60; *see also* Lucas's Response SOF ¶ 60 ("Not disputed[.]").

While the investigation was pending, two things were going on in the background. *One*, Lucas's Facebook post was becoming "well known throughout the police department," City's SOF ¶ 39; *see also* Lucas's Response SOF ¶ 39 ("Not disputed[.]"), and among the public generally, *see* City's SOF ¶ 40 (Privitera testifying that, "'after a newspaper article came out,'" he "'got quite a few calls'" about Lucas's Facebook post (quoting Privitera Dep. at 45:19–22)); *see also* Lucas's Response SOF ¶ 40 ("Objection to anonymous hearsay.").[8] *Two*, as we've discussed, "Lucas was under consideration for a position with the DEA West Palm Beach Task Force." City's SOF ¶ 62; *see also* Lucas's Response SOF ¶ 62 ("Not disputed[.]").

On October 8, 2020, "nine days after Lucas was served with her written reprimand—Captain Russ Mager wrote a memorandum to Assistant Chief Sapino, recommending Lucas be selected for the DEA Task Force." City's SOF ¶ 70 (citing Delray Beach Police Department Memorandum ("Recommendation") [ECF No. 98-20] at 1); *see also* Lucas's Response SOF ¶ 70 ("Not disputed, but her nomination had been anticipated[.]"). Both Chief Sims and Assistant Chief Sapino "signed and approved Captain Mager's" recommendation "that Lucas be selected for the DEA task force." City's SOF ¶ 71; *see also* Lucas's Response SOF ¶ 71 ("See response to ¶ 70, which Ms. Lucas adopts in response to this paragraph.").

But, despite the Police Department's recommendation, Lucas didn't get the job. On November 30, 2020, DEA Agent Ian McVane "e-mailed Lieutenant Anthony Martinez, notifying him

---

[8] Again, these comments from members of the public aren't inadmissible hearsay because they're not offered to prove the truth of the matter asserted; they're only meant to show the state of mind of people in the community.

that '[a]fter a thorough review of the Internal Affairs investigation for Agent Nicole Lucas, the DEA
. . . would like to respectively [sic] pursue another . . . candidate for the available Task Force Officer
position.'" City's SOF ¶ 77; *see also* Lucas's SOF ¶ 77 ("Not disputed[.]"). About three weeks before
he relayed this message, Agent McVane had requested "copies of documents constituting Lucas'[s]
Internal Affairs investigation file," and Lieutenant Privitera had "e-mailed him" those copies. City's
SOF ¶ 75; *see also* Lucas's Response SOF ¶ 75 ("Not disputed[.]"). Notably, "[n]either Chief Sims nor
Sapino" ever "notified the DEA about Lucas'[s] Internal Affairs file." City's SOF ¶ 73; *see also* Lucas's
SOF ¶ 73 ("Not disputed[.]"). And there's no dispute that it was "[t]he DEA, not the City," who
"made the decision not to select Lucas for the Task Force." City's SOF ¶ 79; *see also* Lucas's SOF ¶ 79
("Not disputed[.]"). Ultimately, the DEA "selected Officer Barry Kopplin for the Task Force, the only
other officer in the VIN Unit who was qualified and who showed interest in the position." City's SOF
¶ 81; *see also* Lucas's Response SOF ¶ 81 ("Not disputed[.]").

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms,
this standard provides that the mere existence of *some* alleged factual dispute between the parties will
not defeat an otherwise properly supported motion for summary judgment; the requirement is that
there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).
An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at
248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find
for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of
a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997);
*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always

bears the initial responsibility of informing the district court of the basis for its motion [ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with 'specific facts showing there is a genuine issue for trial.'" *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

In Count I of her Amended Complaint, Lucas asserts a retaliation claim under 42 U.S.C. § 1983 "for Violation of her First Amendment Right to Free Speech." First Amended Complaint for Damages and Injunctive Relief ("Am. Compl.") [ECF No. 25] at 1. Since both parties are moving for summary judgment on this count,[9] we'll start here. After that, we'll address Count II—Lucas's claim under § 1983 for "Violation of her Clearly Established Fourteenth-Amendment Right Against Sex Discrimination." Lucas's MSJ at 13.

### I.    The First Amendment Retaliation Claim

The First Amendment to the U.S. Constitution "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (cleaned up). While "a public employee ha[s] no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights, . . . [t]hat dogma has been qualified in important respects." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). As relevant here, for instance, "public employees *do not* surrender all their First Amendment rights by reason of their employment." *Ibid.* (emphasis added). "Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

---

[9] *See* Lucas's MSJ at 10 ("Nicole Osfowitz Lucas [ ] respectfully requests this Court to enter summary judgment in her favor on Count I of the complaint."); *see also* City's MSJ at 2 ("[Lucas] brings two counts under 42 U.S.C. § 1983: Count I claiming the City violated her free speech rights under the First Amendment . . . . As demonstrated below, judgment should be entered as a matter of law in the City's favor for at least four reasons.").

We analyze a public employee's First Amendment retaliation claim under the test laid out in "*Pickering v. Board of Education*—the pathmarking case governing public employees' free-speech-rights[.]" *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1050 (11th Cir. 2022) (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968)); *see also Bryson*, 888 F.2d at 1565 ("In *Pickering*, the landmark case concerning a public employee's first amendment rights, the Supreme Court held that a public employee's interests are limited by the state's need to preserve efficient governmental functions."). The "*Pickering* test," *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015), goes something like this:

> First, the plaintiff must make a prima facie case by showing, by a preponderance of the evidence, that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech.

*McAlpin v. Sneads*, 61 F.4th 916, 928 (11th Cir. 2023) (quoting *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1219 (11th Cir. 2001) (cleaned up)). "The first two inquiries are questions of law for the court." *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) (citing *Moss*, 782 F.3d at 617–18). In cases where the employee *wasn't* "demote[d] or discharge[d]," we ask, at the third step of the prima-facie inquiry, whether the employee's speech played a substantial part in the "alleged adverse employment action." *Millspaugh v. Cobb Cnty. Fire & Emergency Servs.*, 2022 WL 17101337, at *6 (11th Cir. Nov. 22, 2022) ("Third, if the plaintiff's speech is protected speech, the plaintiff must show that his speech was a substantial motivating factor in the alleged *adverse employment action*." (emphasis added & cleaned up)); *see also Smith v. City of Tallahassee*, 789 F. App'x 783, 786–87 (11th Cir. 2019) ("To establish a prima facie case of First Amendment retaliation, the employee must show . . . (3) the speech played a substantial or motivating role in the employer's decision to take the *adverse action*." (emphasis added));

*Valdes v. City of Doral*, 662 F. App'x 803, 811 (11th Cir. 2016) ("Assuming Plaintiff's speech is protected, the third stage of the analysis requires him to show that it was a substantial motivating factor in an *adverse employment action* taken against him." (emphasis added)). We thus aren't *only* concerned with demotions or discharges at this third step. *See, e.g.*, *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1300 (11th Cir. 2005) ("In addition, any other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee qualifies as an adverse employment action." (cleaned up)).

The first step is easy because the parties *agree* that Lucas's speech was "on a matter of public concern." *See* Lucas's MSJ at 1 ("Lucas's [Facebook] post about Black Lives Matter was speech protected by the First Amendment—speech in her role as a private citizen about a *matter of public concern*." (emphasis added)); *see also* City's MSJ at 12 ("Assuming Lucas'[s] speech involved a matter of public concern . . . ."). Still, Lucas's First Amendment claim fails at the second and third steps. At the second step, Lucas cannot show that her interest in speaking out about Black Lives Matter outweighed the Police Department's interest in promoting "the efficiency of the public services it performs through its employees." *McAlpin*, 61 F.4th at 928 (quoting *Anderson*, 239 F.3d at 1219 (cleaned up)). At the third step, Lucas cannot establish that the City took *any* adverse actions against her. Because it'll allow our analysis to flow more smoothly, we'll address these two points in *reverse* order.

### a. Adverse Employment Actions

#### i. The Law of Adverse Actions

Our Circuit's standard for determining whether, in the context of the First Amendment, an employer has engaged in an adverse action is, to borrow the Circuit's own words, "a bit muddled." *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1377 (11th Cir. 2021). To help us explain how we got here—and why we think Lucas's claim fails either way—we'll the trace the standard's evolution back to 2004,

when the Eleventh Circuit "held that a 'public employer retaliates in violation of the First Amendment when it takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech.'" *Ibid.* (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004) (emphasis added & cleaned up)), *abrogated as to Title VII cases by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In *Stavropoulos*, the Circuit had clarified that "an adverse employment action" is one that "involve[s] an important condition of employment," such as "discharges, demotions, refusals to hire or promote, and reprimands." *Stavropoulos*, 361 F.3d at 619.

One year after *Stavropoulos*, however, our Circuit set out a different test—the "ordinary firmness test"—for *private* citizens. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Under the "ordinary firmness test," a plaintiff "suffers adverse action if the defendant's alleged retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Ibid.* (cleaned up). As we've hinted, though, the *Bennett* test applied only to *private* citizens— not to *public* employees. *See id.* at 1252 ("[P]rivate citizens must establish that the retaliatory acts would deter a person of ordinary firmness from exercising his or her First Amendment rights. The defendants' reliance on retaliation cases in the public employment context is misplaced, because different interests are at stake there. In the employment context, the required adverse action in a retaliation claim is an 'adverse employment action.' Plainly, private citizens cannot suffer adverse employment actions at the hands of public officials who are not their employers." (quoting *Stavropoulos*, 361 F.3d at 616)). So far, so good. Unfortunately, all of this became very confusing in 2016, when the Eleventh Circuit applied the "ordinary firmness test" to a case "involving [a] First Amendment retaliation claim of a police officer . . . without mentioning *Stavropoulos*." *Bell*, 6 F.4th at 1378 (citing *Bailey v. Wheeler*, 843 F.3d 473, 477 (11th Cir. 2016)).

And the Circuit hasn't yet clarified whether, in assessing the First Amendment retaliation claim of a *public* employee, we should be applying the older test from *Stavropoulos* or the newer, ordinary-

14

firmness test laid out in *Bennett*. *See ibid.* ("Because Deputy Bell loses under both the *Stavropoulos* and *Bennett* standards, we do not need to confront the question of what prior decision to apply, and mention the potential intra-circuit conflict to flag the matter for litigants, attorneys, and future panels."). *Bell* did, however, give us something in the way of a helpful clue when it noted that, "[a]lthough the two formulations of adversity are qualitatively different, they nevertheless share a common element: both ask whether the challenged conduct would, objectively, chill or deter the exercise of constitutionally protected speech." *Id.* at 1379 (first citing *Stavropoulos*, 361 F.3d at 619; and then citing *Bennett*, 423 F.3d at 1250). The court then resolved the merits of the case by honing in on that "common element" and asking *only* whether the alleged adverse action "deter[ed] a reasonable person from exercising his First Amendment rights." *Ibid.* We'll follow *Bell* here and evaluate Lucas's claim by reference to this common element. When we do that, as we're about to see, we easily conclude that Lucas has failed to create a genuine dispute of material fact as to that element.

### ii. Lucas Didn't Suffer an Adverse Employment Action

Lucas says that she suffered an adverse employment action in three ways: (1) by virtue of being placed on paid "suspen[sion]";[10] (2) through the written reprimand, which came in the form of a "Professional Conduct charge against her"; and (3) because of the Police Department's action in "forwarding her internal-affairs file to the DEA to sabotage her appointment to the DEA task force." Am. Compl. at 13. In deciding whether these three actions constitute an adverse employment action, we must "consider the [City's] acts both individually and collectively." *Akins*, 420 F.3d at 1301; *see also*

---

[10] We say "suspension" because that's what Lucas calls her paid leave. But *the record* uniformly refers to Lucas's absence from official duty as "administrative leave." *See, e.g.*, City's SOF ¶ 30 ("Chief Sims instructed Lieutenant Privitera and Sergeant Gary Ferrero to Place Lucas on paid *administrative leave* pending an internal investigation." (emphasis added)); Lucas's Response SOF ¶ 30 ("Not disputed[.]"). We note this discrepancy here only to clarify that, whatever they call it, the parties are discussing *one* paid-leave event. For the sake of record consistency, we'll use "administrative leave" to refer to Lucas's status.

*Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("While the other actions of which [the plaintiff] complains might not have individually risen to the level of adverse employment action . . . , when those actions are considered collectively, the total weight of them [can] constitute an adverse employment action." (cleaned up)). So, we'll start by evaluating each alleged adverse employment action on its own. Then, having determined that *none* of the three qualify as adverse employment actions individually, we'll assess them all collectively.[11]

### 1.   The Alleged Adverse Actions *Individually*

#### a.   The Administrative Leave

With that background in mind, we'll start—as Lucas does—with her administrative leave. Here, we have little trouble agreeing with the City that Lucas's administrative leave "was not an adverse employment action." City's MSJ at 5. In *Bell*, the Eleventh Circuit found that the plaintiff, a Broward County Sheriff's Deputy, *hadn't* suffered an adverse employment action when he was placed on a "five-day suspension with pay pending an investigation into his conduct[.]" *Bell*, 6 F.4th at 1379. In reaching this conclusion, the Eleventh Circuit looked to the Fifth Circuit, which had "held that a public employee's suspension with pay pending an investigation does not constitute adverse employment action for purposes of a First Amendment retaliation claim." *Ibid.* (citing *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000)). Deputy Bell's "temporally-limited suspension pending an investigation

---

[11] Because the "Eleventh Circuit noted that the standards for the adverse employment action requirement for the First Amendment and Title VII retaliation claims are consonant and relies on Title VII and First Amendment retaliation cases interchangeably," *Leigh v. Avossa*, 2019 WL 1296881, at *17 (S.D. Fla. Mar. 21, 2019) (Marra, J.), we'll occasionally draw on Title VII cases to help us analyze the challenged actions in this case—precisely as the Circuit often does, *see, e.g.*, *Akins*, 420 F.3d at 1301 n.2 ("Although *Meeks* involved a Title VII claim, we noted in *Stavropoulos* that while we have not explicitly equated the First Amendment retaliation's 'important condition of employment' with Title VII's adverse employment action requirement, we regularly use First Amendment cases to inform our analysis of Title VII retaliation claims. We observed that the two standards are consonant. As this is our practice, we cite some Title VII cases to inform our analysis here." (quoting *Stavropoulos*, 361 F.3d at 619–20)).

into alleged misconduct" (the court felt) would not deter "a reasonable person from exercising his First Amendment rights." *Ibid.*

That's perfectly consistent with our Circuit's well-settled view that a "paid suspension" is a "useful tool for an employer to hit 'pause' and investigate when an employee has been accused of wrongdoing." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021); *see also, e.g.*, *Turner v. Williams*, 65 F.4th 564, 573 (11th Cir. 2023) ("After being questioned at the scene of the [officer-involved shooting], Turner was brought into a police vehicle with the assistant chief, who noted the lack of alcohol smell on Turner and placed him on paid administrative leave pending an investigation of the [shooting]."); *Breaux*, 205 F.3d at 158 ("Although Breaux was placed on administrative leave from late *April to July* 1994, Breaux was paid while on leave and returned to his pre-leave position. Thus, Breaux suffered no adverse action with respect to the leave." (emphasis added)); *accord Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) ("We agree with our sister circuits, and find that the [University Police] Department's placement of Nichols on paid administrative leave [for three months] pending the results of his fitness-for-duty psychological examinations did not constitute a materially adverse action."). And a pause pending an investigation of alleged wrongdoing is *exactly* what happened here. *See* City's SOF ¶ 30 ("Chief Sims instructed Lieutenant Privitera and Sergeant Gary Ferreri to place Lucas on *paid* administrative leave *pending* an internal investigation." (emphases added)); *see also* Lucas's Response SOF ¶ 30 ("Not disputed[.]"). True, the *Bell* Court declined to "issue a broad ruling about whether a public employee's suspension with pay always constitutes or never constitutes an adverse action for purposes of a First Amendment retaliation claim." *Bell*, 6 F.4th at 1379. Still, we find that Lucas's paid administrative leave—during which she retained all of her pay and benefits and at the end of which she was allowed to return to work with her full salary and benefits intact, *see* City's SOF ¶ 33 ("While on administrative leave, Lucas continued to receive her full salary

and benefits."); Lucas's Response SOF ¶ 33 ("Not disputed[.]")—is virtually indistinguishable from the kinds of leave the Eleventh Circuit has found insufficient to constitute an adverse action.

As Lucas acknowledges, "'[n]o Circuit has held that a simple paid suspension, in and of itself, constitutes an adverse employment action.'" Plaintiff's Response to Defendant's Motion for Summary Judgment ("Lucas's Response MSJ") [ECF No. 108] at 5 (quoting *Davis*, 19 F.4th at 1266). Still, she maintains that "the suspension [she] suffered—being off work for two months, having her badge and gun taken away from her in front of her children, having to stay in her house during working hours and having to undergo a psychiatric exam before she could return to work—is not a 'simple paid suspension.'" *Ibid.* Two problems with this. *One*, she cites no case for her view that the length of the paid leave, the fact that her gun and badge were taken in front of her children, or the requirement that she take a psychiatric exam make any difference at all to this analysis. She's thus forfeited any such argument. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited]."); *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023) ("'We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments *and authority*.'" (quoting *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (emphases added))); *MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1346 (S.D. Fla. 2021) (Altman, J.) ("The law demands that lawyers present their clients' cases with argument *and citation*. It doesn't—nor should it—permit lawyers to fling whatever arguments they might conjure (however far-fetched or frivolous) at the judge in the hopes that, by a prodigious use of a Westlaw account, that intrepid judge (and his smart law clerk) might find the one case that stands in support of their proposition." (emphasis added)). *Two*, many of these factors were present in some of the cases we've cited—to no effect. *See, e.g., Breaux*, 205 F.3d at 158 (holding that "administrative

leave from late April to July 1994" and "requiring Breaux to undergo a psychological exam after Breaux's intemperate remark to a fellow employee also is not an adverse employment action"); *Nichols*, 510 F.3d at 787 ("[P]lacement of Nichols on paid administrative leave [for three months] pending the results of his fitness-for-duty psychological examinations did not constitute a materially adverse action."); *cf. Moore v. Miami-Dade Cnty.*, 2005 WL 3273722, at *11 (S.D. Fla. Sept. 30, 2005) (Simonton, Mag. J.) ("Plaintiffs were placed on administrative leave for a little over one month during the pendency of the internal investigation, during which time, they received their regular pay and benefits. Accordingly, they did not suffer the adverse employment actions necessary to support their retaliation claims."). Lucas's paid leave, in short, wouldn't "deter a reasonable person from exercising his First Amendment rights" and (thus) doesn't qualify as an adverse employment action. *Bell*, 6 F.4th at 1379.

### b.  The Written Reprimand

Lucas's reliance on the written reprimand fares no better. The Eleventh Circuit has been clear that a written reprimand (standing alone) doesn't constitute an adverse employment action. *See, e.g.*, *Akins*, 420 F.3d at 1301 ("Plaintiffs allege that they suffered the following adverse employment actions: *unwarranted reprimands*, a negative work evaluation, threat of job loss . . . . Of the adverse employment actions alleged by Plaintiffs, *only* constructive discharge or constructive transfer can be said to have negatively affected them." (emphases added)). The plaintiffs were unsuccessful in *Akins* because they never established that the "reprimands . . . *affected* the terms and conditions of their employment or their status as employees." *Ibid.* (emphasis added). The defendant's actions in *Akins*, therefore, "whether considered individually or collectively," didn't rise to the level of adverse employment actions "because they did not harm [the] Plaintiffs." *Id.* at 1302. And the Eleventh Circuit has been pellucid "that 'memoranda of reprimand or counseling that amount to no more than a mere scolding, *without any following disciplinary action*, do not rise to the level of adverse employment actions[.]'" *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 713 (11th Cir. 2013) (quoting *Davis v. Town of*

*Lake Park, Fla.*, 245 F.3d 1232, 1236 (11th Cir. 2001) (emphasis added)). To satisfy the Circuit's test, "[t]he negative evaluation must *actually* lead to a material change in the terms or conditions of employment[.]" *Ibid.* (emphasis added); *see also Summerlin v. M&H Valve Co.*, 167 F. App'x 93, 97 (11th Cir. 2006) ("The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." (citing *Pennington*, 261 F.3d at 1267)).

Lucas's reprimand falls squarely into this reprimand-without-harm category. As she concedes, "[her] reprimand had no effect on her pay, job duties, or any of the terms of her employment." City's MSJ at 6; *see also* City's SOF ¶ 60 ("The City did not reduce Lucas's salary or benefits or any other term [sic] or conditions of her employment."); *see also* Lucas's Response SOF ¶ 60 ("Not disputed[.]"). Indeed, because "[t]he City did not demote or terminate Lucas," City's SOF ¶ 61; *see also* Lucas's Response SOF ¶ 61 ("Not disputed[.]"), it took no additional disciplinary action *after* it issued the written reprimand, *see* City's SOF ¶ 59 ("The written reprimand was the only discipline the City imposed upon Lucas based on the Facebook post."); *see also* Lucas's Response SOF ¶ 59 ("<u>See</u> response to ¶ 56, which Ms. Lucas adopts in response to this paragraph.").[12]

Lucas doesn't dispute any of this. Indeed, the closest she comes to arguing that the reprimand had *any* effect on her employment is on pages 6–7 of her MSJ Response: "In the case at bar," she writes there, "*it was foreseeable that if* Chief Sims ordered an internal-affairs investigation into Agent

---

[12] Lucas's response to paragraph 56 says only this: "Not disputed, but not relevant to summary judgment other than to establish that Chief Sims issued Ms. Lucas a written warning because of her private Facebook post, which the Court of Appeals for the Eleventh Circuit recognizes as an adverse action under the First Amendment." As we've seen, however, the Eleventh Circuit has *never* said that. In any case, again, Lucas fails here to adduce any evidence for her disputation. We thus accept the City's asserted fact as true for purposes of summary judgment. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by: *citing to particular parts of materials in the record*, including depositions, documents, electronically stored information . . . [.]" (emphases added)); *see also* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply.").

Lucas's facebook post, entered a written reprimand and released the story to news outlets that the Drug Enforcement Administration would become aware of it and cancel her posting to its Palm Beach County Task Force." Lucas's Response MSJ at 6–7 (emphasis added). But she offers no *evidence* for her claim that Chief Sims "released" the written reprimand to news outlets. The record, in fact, supports a different story—that the DEA learned about the reprimand when it *requested* Lucas's IA file. *See* City's SOF ¶ 72 ("In connection with the DEA's consideration of Lucas for the Task Force, DEA agent Ian MacVane requested from the Department Lucas'[s] Internal Affairs file."); *see also* Lucas's Response SOF ¶ 72 ("Not disputed[.]"); City's SOF ¶ 73 ("Neither Chief Sims nor Sapino notified the DEA about Lucas'[s] Facebook post or the investigation into Lucas'[s] Facebook post."); Lucas's Response SOF ¶ 73 ("Not disputed[.]"). And we won't allow Lucas—who had nearly fifteen months to propound discovery on the DEA about how and where it discovered the reprimand—to survive summary judgment with speculation. *See, e.g.*, *Fernandez v. Hotwire Commc'ns, Ltd.*, 2022 WL 4598638, at *13 (S.D. Fla. Sept. 30, 2022) (Altman, J.) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (cleaned up))); *Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1220 n.6 (S.D. Fla. Mar. 21, 2022) (Altman, J.), *appeal dismissed sub nom. Marcellus Wills v. Walmart Assocs. Inc*, 2022 WL 2821277 (11th Cir. June 17, 2022) ("[S]peculation isn't enough to survive summary judgment."); *Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contentions[.]" (emphasis in original)). Having conceded that neither the terms and conditions of her employment nor her status as an employee were in the least bit affected by the reprimand, Lucas cannot show that a "reasonable person" would have been "deterred," in these circumstances, "from exercising his First Amendment rights." *Bell*, 6 F.4th at 1379.

### c.  The DEA's Decision

Finally, for two reasons, Lucas has failed to create a genuine dispute of material fact on her claim that the City "forward[ed] her internal-affairs file to the DEA *to sabotage* her appointment to the DEA task force." Am. Compl. 13 (emphasis added). *First*, Lucas cites *no* evidence for her view that the City was trying to "sabotage" her chances with the DEA. *See generally* Lucas's MSJ; Lucas's Response MSJ; Lucas's Reply. And her speculation that the City "leaked" the reprimand, Am. Compl. at 13, is completely unsupported. As we've said, "'[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment.'" *Atakora v. Franklin*, 601 F. App'x 764, 766 (11th Cir. 2015) (quoting *Flagstar Enters., Inc. v. Burch*, 267 Ga. App. 856, 858 (2004)); *see also Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."); *Celotex*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.").

In any event, the record evidence shows just the opposite: that the City *recommended* Lucas for the DEA position and *wanted* her to get it. *See* Lucas Dec. Dep. at 67:21–23 ("Q. Are you aware that Chief Sims also signed off on this recommendation? A. Yes."); *see also* Recommendation at 1 ("In December 2020, Agent M. Geraci's term in the Drug Enforcement Agency Task Force is coming to an end. . . . Based on [Lieutenant A. Martinez's and Sergeant B. Cambell's] input and the necessary qualifications, we are recommending Agent Nicole Lucas for this position."); City's SOF ¶ 71 ("Both Assistant Chief Sapino and Chief Sims signed and approved Captain Mager's Memorandum that Lucas

be selected for the DEA task force."); Lucas's Response SOF ¶ 71 ("<u>See</u> response to ¶ 70, which Ms. Lucas adopts in response to this paragraph.").[13]

Lucas (it's true) *does* question Chief Sims's motives for recommending her. *See* Lucas Dec. Dep. at 71:9–17 ("I don't think that he had any other option, but to approve it because all of the people below him, the people who know my work, are the ones who recommended it. . . . It would be clear that he mistreated me if he then went against all of these people[.]"). But, ignoring for a moment the improper speculation, Chief Sims's motive for the recommendation doesn't change the fact that he did, in fact, nominate her—nor does it lend any support to Lucas's claim that anyone at the City ever tried to "sabotage" her.[14]

More problematically, the Eleventh Circuit has already held that merely being "pass[ed] over" for a transfer—without any "serious and material change in the terms, conditions, and privileges of employment" (*e.g.*, a change in "wages, benefits, or rank")—*doesn't* constitute an adverse employment action. *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1032 (11th Cir. 2008); *see also Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 836 (11th Cir. 2015) ("Here, not even a de minimis transfer is at issue because Plaintiff alleges that it was Defendant's *failure* to transfer her that was the adverse action. Yet, she obviously suffered no reduction in pay, prestige, or responsibility by remaining in the same position for which she had been hired: the position of a Financial Analyst. Nor has she

---

[13] As we've seen, in paragraph 70, Lucas says only this: "Not disputed, but her nomination had been anticipated[.]" Lucas's Response SOF ¶ 70.

[14] As we've seen, the City *did* forward Lucas's file to the DEA—but only because the DEA requested it and only *after* the City had recommend Lucas for the position. *See* City's SOF ¶ 72 ("In connection with the DEA's consideration of Lucas for the Task Force, DEA agent Ian MacVane requested from the Department Lucas'[s] Internal Affairs file." (citing Privitera's Nov. 13, 2020 Email to Ian MacVane ("Privitera's Email") [ECF No. 98-21] at 1); Lucas's Response SOF ¶ 72 ("Not disputed[.]"). And, when the City transmitted Lucas's file to the DEA, its email included *no* negative commentary. *See* Privitera's Email at 1 ("Ian – the attached files are per your request, I apologize for not [sic] being delayed. If you have any questions please call me."). Indeed, Lucas concedes that "[n]either Chief Sims nor Sapino notified the DEA about Lucas'[s] Facebook post or investigation into Lucas'[s] Facebook post." City's SOF ¶ 73; *see also* Lucas's Response SOF ¶ 73 ("Not disputed[.]").

alleged that she would have gained additional pay, prestige, or responsibility in one of the two positions on which she bid."); *Harrison v. Int'l Bus. Machines (IBM) Corp.*, 378 F. App'x 950, 954 (11th Cir. 2010) ("Appellant has not provided any evidence that being denied these transfers resulted in a serious and material change in the terms, conditions, and privileges of employment. Therefore, Appellant has failed to prove the denial of transfers resulted in an adverse employment action." (cleaned up)).

Lucas mentions the "prestige" of the Task Force only once—in the introduction to her MSJ, where her lawyer says that the reprimand led to "the loss of a lucrative, *prestigious* assignment to a Drug Enforcement Administration Task Force[.]" Lucas's MSJ at 2 (emphasis added). Four problems with this. *One*, she never actually advances this argument in her MSJ: She doesn't, for instance, cite any cases about the loss of prestige; she doesn't explain how the Task Force opportunity would have added to her prestige; she never even uses the word prestige again *anywhere* in her MSJ. In these circumstances, she's abandoned any argument she could've made about the extent to which the Task Force would've enhanced her prestige. *See Esformes*, 60 F.4th at 635 ("'We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.'" (quoting *Sapuppo*, 739 F.3d at 681)).

*Two*, she *never* uses the word "prestige" (or any other similar word or concept) in her Response to the City's MSJ. *See generally* Lucas's Response MSJ. She thus cannot use any such (supposed) prestige to fend off *the City's* request for summary judgment. *See Schwarz v. Bd. of Supervisors on behalf of Vills. Cmty. Dev. Dists.*, 672 F. App'x 981, 983 (11th Cir. 2017) ("We agree with the district court that Plaintiffs waived these claims by failing to address them in their summary judgment *response*." (emphasis added)).

*Three*, even if she had mentioned the Task Force's prestige in her Response, she never alleges that she missed out on some added prestige in her complaint, *see generally* Am. Compl., and we don't

allow plaintiffs to amend their complaints through their summary-judgment responses, *see, e.g., Cendan v. Sch. Bd. of Broward Cnty., Fla.*, 628 F. Supp. 3d 1191, 1219 (S.D. Fla. 2022) (Altman, J.) ("And it's well-settled that '[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment.'" (quoting *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014)); *see also Walker v. United Parcel Serv., Inc.*, 2021 WL 1089872, at *20 (S.D. Fla. Mar. 22, 2021) (Altman, J.) ("[T]he racial animus allegation appears nowhere in the Amended Complaint—which is reason enough to ignore it . . . . A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (cleaned up)); *Moulton v. Prosper*, 2019 WL 4345674, at *10 (S.D. Fla. Sept. 12, 2019) (Altman, J.) ("It is well-established in this Circuit that a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (cleaned up)). The prohibition against amending a complaint through a summary-judgment response applies even when the plaintiff's new allegations are merely "additional evidence rather than additional claims." *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 708 (11th Cir. 2020) (cleaned up).

*Four*, even if she had done *all* these things, any such reliance on the Task Force's (supposedly) added prestige would fail because she has adduced *no evidence* for the proposition that a position on the Task Force would've been more prestigious than her regular role as an undercover narcotics agent. *See, e.g., Cendan*, 628 F. Supp. 3d at 1206 ("But *no* evidence isn't enough to support an inference—let alone to survive summary judgment." (citing *Cordoba*, 419 F.3d at 1181 (cleaned up))); *Breaux v. NCL (Bahamas) Ltd.*, 2022 WL 2304254, at *8 (S.D. Fla. June 24, 2022) (Altman, J.) ("*No* evidence (it goes without saying) isn't enough to withstand summary judgment.").

And, without any evidence of added prestige, Lucas's claim is significantly *weaker* than the retaliation claims the Eleventh Circuit found insufficient in *Webb-Edwards*, *Hawkins*, and *Harrison*. In those cases, after all, the defendants had actually *denied* the plaintiffs' transfer requests. In our case, by

contrast, the City *wanted* Lucas to get the transfer, but the DEA (an unaffiliated third party) rejected her. We thus cannot say, on these facts, that the City imposed an adverse employment action on Lucas.

Even putting the transfer recommendation aside, though, on the question of "terms, conditions, and privileges," our facts are virtually indistinguishable from *Webb-Edwards*, *Hawkins*, and *Harrison*. Like the plaintiffs in those cases, Lucas "suffered no reduction in pay, prestige, or responsibility by remaining in the same position for which she had been hired[.]" *Hawkins*, 613 F. App'x at 836. On this issue at least our record is clear: "The City *does not change* the salary or benefits of officers detailed to the Task Force pursuant to the Task Force Agreement, and ***would not have changed the salary or benefits of Lucas*** had she been detailed to the Task Force." City's SOF ¶ 68 (citing Declaration of Javaro Sims ("Sims Decl.") [ECF No. 98-6] ¶ 23) (emphases added));[15] *see also* Lucas's Response SOF ¶ 68 ("Not disputed . . . . However, historically Delray Beach Police Department officers assigned to the DEA task force earn substantial overtime during that assignment.").[16] Lucas, in short, has no evidence that the City tried to "sabotage" her Task Force application.

---

[15] That's important because, under its agreement with the DEA, "the City, not the DEA, 'remain[s] responsible for establishing the salary and benefits, including overtime, of the officers assigned to the Task Force, and for making all payments due them.'" City's SOF ¶ 67 (quoting Task Force Agreement ¶ 6); *see also* Lucas's Response SOF ¶ 67 ("Not disputed[.]").

[16] We've already explained (*see supra* note 4) why we won't credit Lucas's unsupported contention that "historically" officers assigned to the task force would "earn substantial overtime[.]" We add here only Lucas's *concession* that the Task Force assignment *wouldn't* have guaranteed her *any* overtime. *See* City's SOF ¶ 69 ("The Task Force does not guarantee an officer any particular amount of overtime pay, including more overtime pay than that which the officer would ordinarily receive while not on the Task Force." (first citing Task Force Agreement ¶ 6; and then citing Sims Decl. ¶ 24)); *see also* Lucas's Response SOF ¶ 69 ("See response to ¶ 68, which Ms. Lucas adopts in response to this paragraph."). And, again, Lucas doesn't dispute *anything* in paragraph 68. *See* Lucas's Response SOF ¶ 68 ("Not disputed . . . ."). Lucas thus cannot show that the transfer denial affected her overtime pay at all. *See Menefee v. Montgomery Cnty. Bd. of Educ.*, 137 F. App'x 232, 234 (11th Cir. 2005) (explaining that, "[a]lthough proof of direct economic consequences is not required in all cases, the asserted impact 'cannot be speculative'" (quoting *Davis*, 245 F.3d at 1239)); *see also A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1345 (S.D. Fla. 2021) (Altman, J.) ("To survive summary judgment, therefore, the plaintiff must proffer some evidence of actual damages. While the plaintiff need not

*Second*, it was ultimately the DEA (not the City) that rejected Lucas. The DEA informed the City of its decision to pass on Lucas by email: "After a thorough review of the Internal Affairs investigation for Agent Nicole Lucas," the DEA agent wrote, "the DEA West Palm Beach District Office would like to respectively [sic] pursue another Delray Beach Police Department candidate for the available Task Force Officer position." Agent Ian McVane Email [ECF No. 98-22] at 1; *see also* City's SOF ¶ 77 (quoting the same email); Lucas's SOF ¶ 77 ("Not disputed[.]"). Lucas has thus failed to show that she suffered an adverse employment action "at [the City's] hands." *White v. Hall*, 389 F. App'x 956, 960 (11th Cir. 2010) ("With respect to the three defendants who were not involved in the termination decision—Ranger, Cochran, and Moorer—they were entitled to summary judgment because White did not show that he suffered an adverse employment action at their hands. No alleged action by these three defendants tangibly, seriously, or materially adversely affected the terms, conditions, or privileges of White's employment as viewed by a reasonable person in the circumstance." (cleaned up)). And this is important for two interrelated reasons.

*One*, since the City had *no say* over the DEA's decision, Lucas probably lacks standing to bring this aspect of her claim.[17] To establish her standing, a plaintiff must "have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016)). Lucas falters at the last two steps of this standing test. To understand why, let's rehash where we've been. The administrative leave, we've said, doesn't entitle Lucas to any relief. So, while she has standing to

---

calculate these damages with mathematical precision, he may not advance a damages case that's based only on speculation or guesswork." (cleaned up)).

[17] Although the City never challenges Lucas's standing, it's our responsibility to "zealously [e]nsure that jurisdiction exists over a case," which means that we "should [ ] raise the question of subject matter jurisdiction [*sua sponte*] at any point in the litigation where a doubt about jurisdiction arises." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

assert *that* aspect of her claim, it gets her nowhere. So too with the written reprimand, which didn't affect the terms, conditions, or privileges of her employment. That leaves us *only* with this third theory—in which Lucas claims that she was harmed by the DEA's decision not to hire her. Since the DEA isn't a party here, however, we cannot order anyone to undo the DEA's decision. The best we can do is declare that the City was wrong to include a written reprimand in Lucas's file. Even if we were willing to do that, however, Lucas still couldn't show that, without that reprimand, the DEA would've hired. She, after all, has *no evidence* that the DEA rejected her *because of* that reprimand. On this point, we know only what the DEA agent said in his email—that, "[a]fter a thorough review of the Internal Affairs investigation for Agent Nicole Lucas," the DEA decided to pass on Lucas's application. *See* Agent Ian McVane Email at 1. But we don't know *what else* was in that IA file. And, despite having fifteen months to propound discovery on the DEA (and the City), Lucas hasn't told us what else was in that file. Remember that it was *Lucas's burden* at this stage of the case to produce evidence of her standing. *See Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) ("The party invoking federal jurisdiction bears the burden of proving standing. Moreover, each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.' Therefore . . . when standing is raised at the summary judgment stage, the plaintiff can no longer rest on 'mere allegations.' Instead, the plaintiff must 'set forth by affidavit or other evidence specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))); *see also United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) ("At the summary judgment stage, the district court must ask itself whether 'a fair-minded jury' could find that the claimant had standing on the evidence presented." (quoting *Anderson*, 477 U.S. at 252)). Without any indication of *what else* was in her IA file—or even what about that file prompted the DEA to reject her—Lucas cannot show that, *but for*

the reprimand, the DEA would've hired her. She's thus failed to establish (1) that her injury (not getting the DEA job) is "fairly traceable" to the City's conduct (the reprimand) and (2) that a favorable decision from us (deleting the reprimand from her file) would redress her alleged injury (the DEA rejection). Having failed to prove causation and redressability, Lucas lacks standing to assert this third aspect of her claim.

*Two*, even on the merits,[18] we've found no support—and Lucas certainly hasn't cited any—for the proposition that a public employer's *non-adverse* action can become *adverse* solely because of the independent actions of a third party. Here's what we mean. The City (the record seems clear) did nothing wrong here: It paused Lucas's official duties during an investigation into her conduct—all without touching her pay, her rank, or her benefits. At the end of that investigation, it issued her a written reprimand—again, without altering the terms, conditions, or privileges of her employment. It then even recommended her for the DEA task force she was interested in. Unfortunately, for reasons that aren't entirely clear, the DEA (on its own and without any prodding from the City) decided to pass on her application. On these facts, we think it would be absurd to hold the City accountable for the independent actions of an unaffiliated third party.

Against all this, Lucas cobbles together a mostly unintelligible three-paragraph response—the first half of which she devotes to the (inapposite) "eggshell skull" doctrine, and in the second half of which she makes a passing reference to the "cat's paw" theory. Lucas's Response MSJ at 5–6 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (emphasis added & cleaned up)). We won't spend much time dissecting Lucas's "eggshell" arguments. Suffice it to say here that the Eleventh Circuit's test for First Amendment retaliation claims is, by its nature, *objective. See, e.g.*, *Bell*, 6 F.4th at 1379 (holding that Deputy Bell's suspension with pay was not an adverse employment action because it would not "deter

---

[18] That is, assuming she even has standing to assert this claim.

a *reasonable person* from exercising his First Amendment rights" (emphasis added)). Whether Lucas meets the typical definition of an "eggshell plaintiff," in other words—*i.e.*, whether she *subjectively* felt the disappointment of her DEA rejection *more acutely* than most officers in her position would have—is neither here nor there.[19]

> As for the cat's paw, Lucas says only this:
>
> As the Supreme Court recognized in considering whether to apply the *cat's paw* theory to employment law, it noted that "[i]n approaching this question, we start from the premise that when Congress creates a federal tort it adopts the background of general tort law."

Lucas's Response MSJ at 6 (quoting *Staub*, 562 U.S. at 417). Again, however, a party cannot survive summary judgment by making a passing reference to a doctrine without explaining whether (or even how) that doctrine might apply to her case. *See Esformes*, 60 F.4th at 635 ("'We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.'" (quoting *Sapuppo*, 739 F.3d at 681)).

In any event—and for two reasons—Lucas's cat's-paw argument would fail *even if* she had properly advanced it. *One*, the cat's-paw theory of liability "provides that a plaintiff may establish causation by showing that the decisionmaker followed a biased recommendation without independently investigating the complaint against the employee." *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021); *see also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory. This theory provides that causation may be established if the plaintiff

---

[19] The "eggshell plaintiff" doctrine is really a creature of tort law. *See Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 n.20 (11th Cir. 1991) (noting that, under "the famous 'eggshell skull principle,'" a "tortfeasor takes his victim as he finds him"). We've seen no case—and Lucas cites to none—in which the doctrine was extended to First Amendment retaliation claims. In these circumstances, we see no reason—and, again, Lucas hasn't given us any—to be the first to extend it.

shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." (cleaned up)). In other words, cat's paw kicks in when the relevant decisionmaker imposes an adverse employment action on an employee *only because of* the biased (and negative) recommendation of the non-decisionmaker. But Lucas hasn't shown that the City gave her a *bad* recommendation. On the contrary, the record is clear that the City (the non-decisionmaker) gave her a *good* recommendation. *See* Lucas Dec. Dep. at 67:21–23 ("Q. Are you aware that Chief Sims also signed off on this recommendation? A. Yes."); *see also* Recommendation at 1 ("In December 2020, Agent M. Geraci's term in the Drug Enforcement Agency Task Force is coming to an end. . . . Based on [Lieutenant A. Martinez's and Sergeant B. Cambell's] input and the necessary qualifications, we are recommending Agent Nicole Lucas for this position."); City's SOF ¶ 71 ("Both Assistant Chief Sapino and Chief Sims signed and approved Captain Mager's Memorandum that Lucas be selected for the DEA task force."); Lucas's Response SOF ¶ 71 ("<u>See</u> response to ¶ 70, which Ms. Lucas adopts in response to this paragraph.").[20]

*Two*, and by the same token, Lucas cannot show that the DEA (the decisionmaker) blindly "followed the [City's] biased recommendation without independently investigating" Lucas's record. As we've seen, the record reveals just the opposite—that the DEA only rejected Lucas "[a]fter a *thorough* review of the Internal Affairs investigation for Agent Nicole Lucas[.]" Agent Ian McVane Email at 1 (emphasis added); *see also* City's SOF ¶ 72 ("In connection with the DEA's consideration of Lucas for the Task Force, DEA agent Ian MacVane requested from the Department Lucas's[s]

---

[20] Again, in paragraph 70, Lucas says nothing relevant: "Not disputed, but her nomination had been anticipated[.]" Lucas's Response SOF ¶ 70.

Internal Affairs file."); Lucas's Response SOF ¶ 72 ("Not disputed[.]"). The cat's-paw theory thus cannot save Lucas here.

### 2.   The Alleged Adverse Actions *Collectively*

Finally, we don't think that viewing the three employment actions collectively changes anything. Again, none of the three actions Lucas complains about—the administrative leave, the reprimand, and the DEA's rejection—"affected the terms and conditions of [her] employment or [her] status as [an] employee[ ]." *Akins*, 420 F.3d at 1301. She wasn't discharged or demoted, she suffered no loss in pay or benefits, and she wasn't transferred to a less desirable (or less prestigious) position than the one she'd been hired for. *Cf. Hawkins*, 613 F. App'x at 836 ("Here, not even a de minimis transfer is at issue because Plaintiff alleges that it was Defendant's *failure* to transfer her that was the adverse action. Yet, she obviously suffered no reduction in pay, prestige, or responsibility by remaining in the same position for which she had been hired: the position of a Financial Analyst. Nor has she alleged that she would have gained additional pay, prestige, or responsibility in one of the two positions on which she bid."); *Harrison*, 378 F. App'x at 954 ("Appellant has not provided any evidence that being denied these transfers resulted in a serious and material change in the terms, conditions, and privileges of employment. Therefore, Appellant has failed to prove the denial of transfers resulted in an adverse employment action." (cleaned up)). Whether viewed individually or collectively, therefore, Lucas's three theories of liability get her nowhere.

Because Lucas suffered no adverse employment action, we **GRANT** the City's MSJ (and **DENY** Lucas's MSJ) as to Count I.

### b.   The City's Interest in Promoting its Public Services

But, even if Lucas *had* suffered an adverse employment action, her claim would still fail at *Pickering*'s second step because she cannot show that her "speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414

F.3d 1313, 1318 (11th Cir. 2005) (citing *Bryson*, 888 F.2d at 1565–66). In determining whether an employee's free-speech interests outweigh the public-employer's interest in the effective and efficient execution of its responsibilities, the Eleventh Circuit has directed us to consider "'(1) whether *the speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.'" *Bryson*, 888 F.2d at 1567 (quoting *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1989)); *see also Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) ("Several factors inform our analysis of the government's interest in the efficient provision of public services: '(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.'" (quoting *Bryson*, 888 F.2d at 1567)). Through these three *Bryson* factors, courts have tried to balance two competing (and important) interests:

> The law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. Of course, a public employee does not have an absolute right to freedom of speech[,] and the State's interest as an employer in regulating the speech of its employees differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general. *To strike the appropriate balance between the respective interests*, we apply the four-step analysis set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989).

*Cook*, 414 F.3d at 1318 (emphasis added & cleaned up); *see also Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). All three *Bryson* factors favor the City here.

The first *Bryson* factor is simple and leans overwhelmingly for the City. "In considering [the *Bryson*] factors in a § 1983 action brought by *police officers* against their public employer," our Circuit has explained, "we are required to consider the fact that members of a law enforcement agency are a part of a quasi-military organization." *Oladeinde*, 230 F.3d at 1293 (emphasis added); *see also Hansen v.*

*Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994) ("[T]he *Pickering* balance is also affected . . . by the special concerns of quasi-military organizations such as police departments."). "In a law enforcement agency," the Circuit has added, "there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers." *Oladeinde*, 230 F.3d at 1293 (citing *Rogers v. Miller*, 57 F.3d 986, 991 (11th Cir. 1995)); *see also Campbell v. Towse*, 99 F.3d 820, 829–30 (7th Cir. 1996) ("It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must be assured of the loyalty of their immediate subordinates, as these subordinates are entrusted with carrying out their orders, at times under the most trying conditions.").

And our record is replete with evidence that Lucas's expletive-laden post—which opens with "[f]uck *everyone who says* black lives matter. I can't take *your fucking bullshit* anymore," Facebook Post at 1 (emphases added)—caused the City justifiable concern about "the potential harm that it could have caused if it had gotten out in the public, and the damage it would do to the family relationships that we have built within our community," Sims Dep. at 120:13–17. Chief Sims, for instance, believed the post could impede the Police Department's "partnerships, trusts, transparency, communications" with the community, and he worried that it might interfere with the Department's ability "to solve a crime within our community due to the lack of people being willing to talk to the police department." *Id.* at 174:12–17. Assistant Chief Sapino similarly believed that the post "clearly undermines and impedes the ability of this agency to achieve legitimacy in our community through collaboration," and he felt that Lucas's comments were "divisive and create[d] a separation between the policy department and the community we serve[.]" Sapino Memorandum [ECF No. 98-15] at 1–2. Nor was Assistant Chief Sapino simply playing with generalities here. In his disciplinary memo, Assistant Chief Sapino *specifically* quoted the Police Department's vision statement and explained how, in his view, Lucas's post had fallen well short of that vision:

> Officer Lucas'[s] comments posted to social media were not only inflammatory but disparaging to the vision statement of our police department and in direct conflict with what our agency strives to achieve. Our vision statement declares: "To be recognized by our community as a department that operates through internal and external engagement highlighted by our belief that we are One Delray, One Community and One Police Department. Unified, we strive to achieve legitimacy through collaboration, transparency, and accountability."
>
> Officer Lucas's comments made on social media do not exemplify unity, nor do they personify "One Delray. One Community. One Police Department." They do the exact opposite. Officer Lucas's Facebook post is *divisive and creates a separation between the police department and the community we serve.*

City's SOF ¶ 43 (quoting Sapino Memorandum at 1–2 (emphasis added & cleaned up)); *see also* Lucas's Response SOF ¶ 43 ("Not disputed, but not relevant to summary judgment: Assistant Chief Sapino did not possess any evidence that any [sic] it was reasonably probable that Ms. Lucas's private Facebook page resulted in any public unrest. Additionally, Assistant Chief Sapino was not the decision maker. (citing Sapino Dep. at 19:13–25)).[21] Assistant Chief Sapino was also worried that, if the post got out into the community, "people 'would feel that we felt the same way at the agency that the post indicated.'" City's SOF ¶ 45 (quoting Sapino Dep. at 55:6–16); *see also* Lucas's Response SOF ¶ 45 ("Not disputed[.]").

And the post *did* get out. Twice in one day—the day after Lucas published the post—two different people showed the post to Chief Sims. *First*, on "June 3, 2020," Chief Sims received "a text message from Sharon Edmonds," which included "a copy of Lucas'[s] Facebook post." City's SOF ¶

---

[21] Lucas here creates a strawman we can quickly tear down. Assistant Chief Sapino *never* suggested that the post *would* create "public unrest." Instead, he was asked only whether he was "aware of anyone outside of Agent Lucas'[s] friends and family Facebook group and Chief Sims that had seen Agent Lucas'[s] post?" Sapino Dep. at 19:13–15. To *that* question, he answered: "in short, no." *Id.* at 19:16. For two reasons, this answer is irrelevant here. *One*, Assistant Chief Sapino's lack of knowledge about the extent to which people outside the Police Department had seen the post tells us nothing about whether civilians had, *in fact*, seen the post. And, as we've explained, Chief Sims testified that two different people (at least one of them a civilian) *had* shown him the post on the day after it was published. *Two*, whether civilians had seen the post or not, Assistant Chief Sapino was clear that his concerns stemmed from his view that the post was very much inconsistent with the Police Department's vision of its public-service role in the community.

7; *see also* Lucas's Response SOF ¶ 7 ("Admitted."). *Second*, at a "protest held at City Hall, an anonymous individual approached Chief Sims and informed him of Lucas'[s] Facebook post, showing it to him on a cell phone." City's SOF ¶ 17 (citing Sims Decl. ¶¶ 7–8); *see also* Lucas's Response SOF ¶ 17 ("Plaintiff objects to ¶ 17 as inadmissible hearsay." (citing *Hammond*, 586 F.3d at 1319 ("Anonymous tips are not admissible into evidence to prove the truth of the matter stated in the tip."))).[22]

      The Eleventh Circuit "ha[s] recognized that a 'government employer's interest in staffing its offices with persons the employer fully trusts is given great weight when the pertinent employee helps make policy, handles confidential information or *must speak or act—for others to see—on the employer's behalf*.'" *Green*, 73 F.4th at 1268 (quoting *Shahar v. Bowers*, 114 F.3d 1097, 1103–04 (11th Cir. 1997) (emphasis added)). "Put another way, the 'First Amendment does not require that an official . . . nourish the viper in the nest.'" *Ibid.* (quoting *Carver v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997)). As a police officer, Lucas represents the Police Department. And she acts (and talks) on behalf of the Police Department every time she wears her badge and interacts with members of her community. That Lucas lost the trust of her superiors would have been "an especially substantial justification for terminating her" because, "[w]hen an employer determines that an employee's speech has a 'detrimental impact on close working relationships or destroys harmony among coworkers,' we must give 'a wide degree of deference to the employer's judgment.'" *Ibid.* (quoting *Morales*, 848 F.2d at 1149). Fortunately for Lucas, the Department decided *not* to go nearly that far. Her superiors let her back on the force with full pay and benefits, recommended her to the DEA for the position she wanted, and allowed her to slide back into the very same role (and rank) she held before. Since the Police

---

[22] We've already explained why we're overruling Lucas's hearsay objection. *See supra* note 5.

Department probably could have fired her, we cannot say that its decision to give her a (far less serious) reprimand was in any way impermissible.

But there's more. On at least two occasions, Lucas's post was used by others to cast doubt on her ability to work effectively as a police officer in her community. *First*, a public defender in another case cross-examined Lucas about the post in a way that suggested Lucas was prejudiced against black people: "I went to a criminal deposition," Lucas attested, "where the Public Defender's office attacked me and said I target black people[.]" Lucas Dec. Dep. at 90:21–91:7. *Second*, Agent McVane (of the DEA) told Lucas that the U.S. Attorney's Office might, in future, be reluctant to prosecute cases in which she was involved as a witness. Here's the relevant exchange from Lucas's depo:

> [CITY COUNSEL ALEN H. HSU]. So you mentioned that Mr. McVane from the DEA discussed the IA file with the department of justice and you further said something like, most likely barring me from ever having or having a federal investigation; is that accurate?

> [LUCAS]. So yes, he did. He told me that he did [sic] and I believe that the AUSA's office will not adopt any of my cases in the future because of that.

> Q. And why do you believe that?

> A. Because, you know, I don't know all the legal terminology, but I spoke with an AUSA there that also thought this case was ridiculous, thought that me not being selected for the DEA was ridiculous and said that they would still take my cases, but they may have to do some kind of hearing with the judge before trial . . . . However, they said that the -- any attorney that was going to take any of my cases would have to do that and she didn't think that all of them would do that[.]

*Id.* at 89:12–90:10 (errors in original). These reactions—from within law enforcement and without—lend further support to the Police Department's view that Lucas's conduct was, at the very least, worth an inquest and (a few months later) a reprimand.

Before leaving this first *Bryson* factor, though, we should make one thing clear: We're not at all suggesting that Lucas *is* prejudiced against black people. Nor are we offering any opinion about whether her post was (or was not) racist. All we're saying is that police departments have an important interest in making sure that their officers are advancing, *not* undermining, the departments' stated

mission. One of the critical aspects of that mission (the City's witnesses have said) is the promotion of a sense, in the minds of the community, that the Department is legitimate. Legitimacy, in turn, is the lifeblood of a police department because, among many other reasons, a population that trusts in its police officers is more likely to *cooperate with* them.[23] And one effective way of getting that kind of community buy-in (as Assistant Chief Sapino explained) is to make people *feel* that police officers are, as it were, on *their* team. It therefore wasn't unreasonable (to our mind) for the Department to have taken the view that Lucas's post—pulsating with rage and laden with expletives—would erode (rather than fortify) the people's trust in their police department, that it would undercut (rather than bolster) the Department's legitimacy in the eyes of the community, and that (in the end) it would compromise (not facilitate) the Department's mission.

But there's something else at play here, too. In addition to its important interest in getting buy-in from the community, the Police Department also has a compelling interest in *winning* the cases it brings for prosecution. That interest is subverted (as the two examples we highlighted above make plain) by a detective who, for whatever reason, is viewed as biased or prejudiced. To understand how, imagine that Lucas becomes a crucial witness in an important case against a dangerous criminal. Would it serve the Police Department (or the community at large) for the U.S. Attorney's Office—wary of Lucas's role in the case—to *refuse* to prosecute? Federal prosecutors aside, how would a jury of twelve people react when, on cross-examination, the defense lawyer asks her pointed questions about her post? Will they slough it off as the personal (if irrelevant) rant of an involved and active citizen? Or will they be reviled by it? If the latter, will they *also* hold the Police Department accountable for her post and, despite strong evidence, set the dangerous man free? We're in no position to predict, of

---

[23] *See* Sims Dep. at 174:12–17 (testifying that the post could impede the Department's "partnerships, trusts, transparency, [and] communications" with the community and interfere with its ability "to solve a crime within our community due to the lack of people being willing to talk to the police department").

course, how these things might turn out. But, given the aggressiveness Lucas displayed in her post—
dripping as it was with acrimony, divisiveness, and antagonism (of whatever dimension)—we think
the Police Department was justifiably concerned.

Ultimately, as the Eleventh Circuit said recently, the "First Amendment does not require a
public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, simply because
the employee recently has waved a political sign." *Morris v. Crow*, 117 F.3d 449, 458 (11th Cir. 1997).
This first *Bryson* factor, in short, weighs heavily in favor of the City.

Lucas fares no better on the second factor—the "manner, time[,] and place of the speech."
The post's "manner" was indisputably confrontational, aggressive, and laden with expletives. It began
with the less-than-friendly "[f]uck everyone who says black lives matter," continued with the not-so-
warm "I can't take your fucking bullshit anymore," and ended with an acknowledgement that, given
the post's belligerent tone, Lucas's former friends might be inclined to "just unfriend me." Facebook
Post at 1. Unsurprisingly, courts have held that the "vulgar and caustic nature of the post[ ] somewhat
weakens Plaintiff's interest in making [it]." *McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1239 (M.D. Fla.
2019) (Byron, J.); *see also Green*, 73 F.4th at 1267 ("We have held that the 'First Amendment does not
require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack[.]'"
(quoting *Morris*, 117 F.3d at 458)).

The timing of the post wasn't great either. Lucas published her comments "in the wake of
nationwide protests following the murder of George Floyd," City's SOF ¶ 1; *see also* Lucas's Response
SOF ¶ 1 ("Plaintiff posted the statement that [the City] quotes in ¶ 1."), at a time when the Police
Department was trying hard to project a sense of "'One Delray, One Community and One Police
Department'" and "'striv[ing]' to achieve legitimacy through collaboration, transparency, and
accountability,'" City's SOF ¶ 43 (quoting the Police Department's vision statement). Again, this case
might have a slightly different feel if Lucas had posted a more measured expression of her opinions.

But especially when coupled with its combativeness, the post's timing could not have been worse as far as the Police Department's objectives of harmony and unity were concerned.

As far as the speech's "place," Lucas published her comments on Facebook—a social-media platform for the widespread and instantaneous dissemination of information. Lucas contests this last point by noting that her Facebook page was for "friends-and-family only." Lucas's Response MSJ at 10. She later tells us that her Facebook network totaled some "150 or so" people. *Ibid.* For two reasons, we don't think that matters. *One*, an online post is in many ways *more* public than an in-person speech. For one thing, an online post can be disseminated to countless people immediately. For another, an online comment will remain on the web *forever*. In any event, had Lucas expressed her feelings at an in-person town hall meeting, attended by 150-or-so people, we'd have little trouble concluding that she'd made her statements *publicly*. The fact that she opted to disseminate her comments to 150 people *online* thus doesn't, from our perspective, change anything. *Two*, just because these 150-or-so people were Facebook "friends" with Lucas didn't prevent them from sharing the post *outside* of Lucas's network. *See, e.g., Gresham v. City of Atlanta*, 542 F. App'x 817, 818 (11th Cir. 2013) ("Plaintiff's Facebook page was 'set to private,' but was available for viewing by an unknown number of Plaintiff's 'friends,' who of course could potentially distribute the comment more broadly."). And that, of course, is exactly what happened. The very day after the post was published, at least two people from the community approached Chief Sims to complain about Lucas's comments, *see* City's SOF ¶ 7 ("On June 3, 2020, the City's Chief of Police Javaro Sims first received a copy of Lucas's Facebook post in a text message from Sharon Edmonds."); *see also* Lucas's Response SOF ¶ 7 ("Admitted."); City's SOF ¶ 17 ("During the portion of the protest held at City Hall [on June 3, 2020,] an anonymous individual approached Chief Sims and informed him of Lucas'[s] Facebook post, showing it to him on a cell

phone."); Lucas's Response SOF ¶ 17 ("Plaintiff objects to ¶ 17 as inadmissible hearsay.")[24]—indicating that at least some of Lucas's "friends" disseminated the post outside her network. This second *Bryson* factor thus likewise favors the City.

The final *Bryson* factor—the "context within which the speech was made"—also supports the City. For this factor, we rely mostly on the Eleventh Circuit's decision in *Snipes v. Volusia Cnty.*, 704 F. App'x 848 (11th Cir. 2017), which analyzed this factor as follows:

> Snipes'[s] messages were disseminated at a time when racial tensions were already running high in the area. Considered in that context, the district court concluded that his comments were phrased in an inflammatory manner that was seemingly designed to increase those tensions. Snipes argues on appeal that the district court was wrong to "infer" such an intent from his statements—particularly at the summary judgment stage. We need not reach this question since, regardless of his intent, Snipes should have been—and in fact was—aware that racial tensions in the County were already high, that the Beach Patrol's image had been severely damaged by its prior scandal, and that public trust in the County was already low. Against that backdrop, he then made comments that he knew were likely to further inflame tensions, to further hurt the Beach Patrol's image, and to further erode trust with members of the public. Put simply, it would have been difficult for Snipes to pick a worse context in which to make his comments. Accordingly, this factor also weighs in favor of the district court's decision.

*Id.* at 854. Our case is very similar. Lucas uploaded her post at a time when the *whole country* was grappling with the death of George Floyd and the public outcry that followed. She, in fact, published her comments just one day before the We Can't Breathe "police reform" rally "held near Delray Beach City Hall." City's SOF ¶ 13; *see also* Lucas's Response SOF ¶ 13 ("Admitted, but irrelevant other than to demonstrate that the death of George Floyd and the reaction to it was a matter of public concern."). And, like the plaintiff in *Snipes*, Lucas's post was "phrased in an inflammatory manner" that was "likely to further inflame tensions, to further hurt the [Police Department's] image, and to further erode trust with members of the public." *Snipes*, 704 F. App'x at 854. In the end, at a time when the Police Department was trying to bring the community together, *see* City's SOF ¶ 44 ("Assistant Chief Sapino

---

[24] We overrule Lucas's hearsay objection again and for the same reasons we outlined in note 5, *supra*.

elaborated that he found the post inappropriate because Lucas 'was separating two parties and saying whatever they believed I don't care, fuck them,' which was contrary to the Department's motto, 'One Delray. One Community. One Police Department.'" (quoting Sapino Dep. at 47:19–25)); *see also* Lucas's Response SOF ¶ 44 ("Not disputed[.]"), Lucas made public comments that (she knew) would tend to tear it apart ("If you don't agree with my feelings PLEASE do not comment. If you don't like me now then just unfriend me." City's SOF ¶ 1 (quoting Facebook Post at 1 (errors in original))). As a quasi-military organization that cares deeply about how its officers interact with the community, *see* City's SOF ¶ 43 ("Our vision statement declares: To be recognized by our community as a department that operates through internal and external engagement highlighted by our belief that we are One Delray, One Community and One Police Department. Unified, we strive to achieve legitimacy through collaboration, transparency, and accountability." (cleaned up)); *see also* Lucas's Response SOF ¶ 43 ("Not disputed[.]"),[25] the Police Department wasn't required to take this public subversion of its mission statement lying down, *see Gresham*, 542 F. App'x at 819–20 ("In this regard, we note that the context of Plaintiff's speech is not . . . one of bringing the matter to the attention of the public to prompt public discussion to generate pressure for such changes. Rather, we agree with the district court that the context was more nearly one of Plaintiff's venting her frustration with her superiors. Thus, we conclude that Plaintiff's speech interest is not a strong one[.]").

In short, even if the City had subjected Lucas to an adverse employment action, its compelling interest in maintaining the effectiveness of its operations would outweigh Lucas's interest in broadcasting her message freely.

Against all this, Lucas advances two arguments—both unavailing. *First*, she cites *Snipes* "[a]s an example of the kind of speech that can impede the efficiency of a police department." Lucas's

---

[25] *See supra* note 21.

Response MSJ at 8. But nothing in *Snipes* suggests that it represents the *only* kind of employee speech a government agency might have an interest in regulating. And the fact is that our case is even more straightforward than *Snipes* was. In *Snipes*, remember, the county had *no evidence* that *anyone* in the community had *ever* complained about the plaintiff's comments. That (of course) didn't matter to the result. *See Snipes*, 704 F. App'x at 852 ("Snipes argues on appeal, as he did before the district court, that the County did not receive any complaint or demands that he be fired and that no rallies or protests were actually held. Whether or not this is true, the County needed to demonstrate *only a reasonable possibility* that such disruptions would occur." (emphasis added)). Our case is very different. As we've highlighted, just one day after Lucas published her sentiments, two *different* members of the community complained about her post to Chief Sims. And, while Lucas's conduct didn't elicit rallies or protests, the same was true in *Snipes*, where the court explained that "rallies or protests" aren't "the only disruptions with which the County and the Beach Patrol need to be concerned." *Id.* at 853. "[W]e have held," the court made clear, "that *maintaining the public's confidence* in local fire and rescue services is a compelling and legitimate government interest." *Ibid.* (emphasis added). In our case, the City *has* shown a "reasonable possibility" that Lucas's comments would disrupt its "compelling and legitimate" interest in "maintaining the public's confidence." Again, at a "'time when [an] officer was just charged with [the] murder of George Floyd'" and "'the entire Midwest was up in arms over that,'" City's SOF ¶ 23 (quoting Privitera Dep. at 37:15–21), Chief Sims "believed that Lucas'[s] post could cause a ruckus and that it could undermine the Police Department's efforts to maintain trust and legitimacy in the eyes of the public," City's SOF ¶ 20; *see also* Lucas's Response SOF ¶¶ 20, 23 ("Not disputed[.]"). "Both [the Eleventh Circuit] and the Supreme Court 'have given substantial weight to government employers' *reasonable predictions* of disruption, even when the speech involved is on a matter of public concern.' It is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" *Green*, 73

F.4th at 1268 (first quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (emphasis in original); and then quoting *Connick*, 461 U.S. at 138).

    *Second*, Lucas suggests that we "should not even get as far as applying the [*Pickering*] balancing test" because her post wasn't "sufficiently connected to her work so that the Court would need to decide whether the employee's free speech interests outweighed the employer's interests[.]" Lucas's Response MSJ at 8 (cleaned up & emphasis added). In saying so, she cites *Pickering* itself for the proposition that, "'in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher,'" the teacher's "'exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment[.]'" *Ibid.* (quoting *Pickering*, 391 U.S. at 574). For two reasons, we disagree.

    *One*, the teacher in *Pickering* had "made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either *impeded the teacher's proper performance of his daily duties in the classroom* or *to have interfered with the regular operation of the schools generally.*" *Pickering*, 391 U.S. at 572–73 (emphases added). In other words, the actions the teacher was challenging in his letter—the school board's "allocation of school funds between educational and athletic programs," *id.* at 570—*neither* undermined his work as a teacher *nor* affected the efficiency of the school's operations.

    Here, by contrast, the connection between Lucas's public employment as a police officer and her comments on Facebook was neither tangential nor insubstantial. *For one thing*, her whole point seems to be that the public has paid too little attention to police officers who are injured or killed in the line of duty: "Look at all the officers killed and injured for trying to protect people . . . . Officers are being killed every fucking day . . . and no one riots or wears shirts that say POLICE LIVES MATTER." Facebook Post at 1. *For another*, her aggressive comments to the community—coming as

they did at an inflection point in the Department's relationship with the public—undermined her employer's stated mission and eroded her superiors' faith in her competency as a steward of the public's trust. *See* City's SOF ¶ 43 ("'To be recognized by our community as a department that operates through internal and external engagement highlighted by our belief that we are One Delray, One Community and One Police Department. Unified, we strive to achieve legitimacy through collaboration, transparency, and accountability.'" (quoting the Police Department's vision statement)).

*Two*, Lucas is just wrong about the kinds of things that trigger a *Pickering* analysis. The Eleventh Circuit cleared this up in *Cotriss v. City of Roswell*, 2022 WL 2345729 (11th Cir. June 29, 2022). In that case, the plaintiff (also a police officer) took "particular issue with the district court's application of the analytical framework that a plaintiff must satisfy to establish a First Amendment claim under § 1983, as set forth in [*Pickering*] and its progeny[.]" *Id.* at *8 (cleaned up & emphasis added). On appeal, the Eleventh Circuit "agree[d] with the district court that Cotriss's raising of the Confederate battle flag on her private property constituted speech made by a government employee acting as a citizen." *Ibid.* In saying so, the court essentially rejected the view Lucas has espoused here:

> As a threshold matter, "[t]o qualify as constitutionally protected speech in the First Amendment[ ] government employment retaliation context," *that merits application of the Pickering analysis*, "the speech must be made by a government employee speaking as a citizen and be on a subject of public concern." This is because the "Constitution does not insulate" a government employee's "communications from employer discipline" when a government employee makes "statements pursuant to [her] official duties."

*Ibid.* (emphasis added) (first quoting *Boyce v. Andrew*, 510 F.3d 1333, 1342–43 (11th Cir. 2007); and then quoting *Garcetti*, 547 U.S. at 421). Lucas is likewise a "government employee" who spoke as a "citizen" (*i.e.*, the statements weren't made pursuant to her official duties) about a matter of public concern. *See* Lucas's MSJ at 1 ("Lucas's [Facebook] post about Black Lives Matter was speech protected by the First Amendment—speech in her role as a private *citizen* about a *matter of public concern*." (emphases added)); *see also* City's MSJ at 12 ("Assuming Lucas'[s] speech involved a matter of

public concern . . . .”). *Pickering*, in short, provides the appropriate framework for her First Amendment challenge.

While we're on *Cotriss*, we'd be remiss if we didn't note that the Eleventh Circuit also affirmed the district court's *ultimate* holding "that, although Cotriss's display of the Confederate battle flag constituted speech made as a citizen related to a matter of public concern, the City's interest in operating an effective Police Department outweighed Cotriss's interest in her speech, thereby allowing the City and the Police Department to discipline Cotriss." *Cotriss*, 2022 WL 2345729, at *4. In our Circuit's view:

> Quasimilitary organizations such as police departments have particularly special concerns when it comes to the efficiency and effectiveness of their operations. Indeed, we have recognized a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department. . . .
>
> Here, on this particular record, the district court properly found that the balance of interests weighed in favor of Defendants. As noted by this Court, to some, the Confederate battle flag is said to evoke the memory of their ancestors and other soldiers who fought for the South in the Civil War. But to many others, it symbolizes slavery, segregation, and hatred. The City, then and now, has a clear interest in maintaining a favorable reputation with the public and in ensuring there are no disruptions within the Police Department. *These interests could be impeded if members of the public, who have valid concerns about the symbolism of the Confederate battle flag, associate the Police Department with the flag.* That was likely given that Cotriss had on some occasions flown the flag while a City police cruiser was parked in her yard. And, in this case, Defendants pointed *to an actual complaint from a citizen* about the flag's display at Cotriss's home and the flag's perceived association with the Police Department, which, in turn, affected that person's trust in the effectiveness of the City's police force.

*Id.* at *9–10 (cleaned up & emphases added). We come out the same way here.

\* \* \*

For all these reasons, we **GRANT** the City's MSJ as to Count I and **DENY** Lucas's MSJ in full.[26]

---

[26] Having rejected Lucas's First Amendment claim under the *Pickering* test, we needn't (and won't) reach the City's *Monell* arguments (*see* City's MSJ at 10–11). *Cf. Bryson*, 888 F.2d at 1567 ("Because we hold that Bryson's speech is not protected under the *Pickering* test, we need not reach the issues of municipal liability and admissibility of evidence.").

## II.     The Sex-Discrimination Claim

Lucas's § 1983 claim "for Violation of her Clearly Established Fourteenth-Amendment Right Against Sex Discrimination," Am. Compl. at 13 (Count II), likewise fails.

"The Equal Protection Clause of the Fourteenth Amendment prohibits race and sex discrimination in public employment." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018); *see also id.* at 1312 n.6 ("Employment discrimination claims against state actors for violation of the Equal Protection Clause are cognizable under § 1983, and are subject to the same standards of proof and use the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981." (citing *Bryant v. Jones*, 575 F.3d 1281, 1296 n.1 & n.20 (11th Cir. 2009))). An employee "must establish the employer's discriminatory intent through direct or circumstantial evidence." *Id.* at 1312. Lucas never suggests that she has any direct evidence of discrimination.[27] She's thus forfeited any such argument. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited]."); *Esformes*, 60 F.4th at 635 ("'We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.'" (quoting *Sapuppo*, 739 F.3d at 681)). If she's to prevail, then, it must be with circumstantial evidence.

---

[27] "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "To be direct evidence, the remark must indicate that the employment decision in question was motivated by race." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002). The Eleventh Circuit has explained that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification are direct evidence of discrimination." *Id.* at 1227 (cleaned up). Direct evidence would include, for instance, "a frank admission from a manager that he refused to hire an applicant because he was black." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)).

### a. Circumstantial Evidence

"A plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, the employee can "satisfy[ ] the burden-shifting framework set out in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). *Second*, the employee can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Lucas's claim fails under both methods.

### i. *McDonnell Douglas*

To show discrimination under the *McDonnell Douglas* framework, the plaintiff "bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Id.* at 1220–21. "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Ibid.* Finally, "[i]f the employer meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination and/or retaliation.'" *Wills*, 592 F. Supp. 3d at 1233 (quoting *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 892 (11th Cir. 2018)).

As we've discussed (*q.v.* our discussion at pp. 15–32), Lucas never suffered an adverse employment action. She thus fails the second prong of her *prima facie* test. We add here only that she also fails the fourth prong. "To meet the fourth prong, a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis*, 918 F.3d at 1228). A similarly situated comparator "will

ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Ibid.* These considerations "leave[ ] employers the necessary breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1228.

Lucas never offers a similarly situated comparator. *See generally* Lucas's Response MSJ. In fact, all she says on this subject is that another officer, "Barry Koplin, a male agent with substantially less experience got the assignment." *Id.* at 13. But she doesn't tell us anything about Koplin: She doesn't allege that he "engaged in the same basic conduct";[28] she doesn't aver that he was subject to the same employment policies, guidelines, or rules; she doesn't claim that he labored under the same supervisor; and she doesn't share *any aspect* of his employment history. In these circumstances, she's failed to identify a comparator who's similarly situated in all material respects. *See, e.g.*, *Harrell*, 2022 WL 898565, at *20 (entering summary judgment against the plaintiff because she "fail[ed] to show that she and Daughtrey [the suggested comparator] engaged in the same basic conduct" (cleaned up)); *Wills*, 592 F. Supp. 3d at 1245 (entering summary judgment against the plaintiff because "[he hadn't] identified a *single* similarly-situated comparator").

Lucas's sex-discrimination claim thus fails the *McDonnell Douglas* test.

### ii. Convincing Mosaic

"As an alternative to the *McDonnell Douglas* burden-shifting test, a plaintiff can survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021).

---

[28] In fact, she says just the opposite: She admits that she's "unaware of anyone else" (presumably including Koplin) who made "a Facebook post comparable to hers." City's SOF ¶ 82; *see also* Lucas's Response SOF ¶ 82 ("Not disputed[.]").

"A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (cleaned up). A convincing mosaic "may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185. But Lucas never creates any such convincing mosaic here.

Lucas offers nothing in the realm of "suspicious timing" since she never suggests that she was discriminated against soon after her employer discovered her sex. She also never mentions any "ambiguous statements," gives us no "bits and pieces from which an inference of discriminatory intent might be drawn," and never identifies "systematically better treatment of similarly situated [male] employees." Instead, she suggests only that "one can find a convincing mosaic in Chief Sims's: . . . Firing, immediately upon becoming chief, Mary Olson . . . ; Passing over for promotion to sergeant the City's only Master Officer, Stephanie Benavides Baker . . . ; Passing over for promotion to captain a female lieutenant, Nicole Guerriero, and using the same investigation excuse . . . ; Pretending to endorse for an assignment to the DEA [Lucas] but issuing her a career-crushing, unfounded written reprimand[.]" Lucas's MSJ Response at 15–16. In saying so, however, Lucas never cites a single piece of evidence in the record. *See generally ibid.* Again, to survive summary judgment, a plaintiff must produce *evidence* (not argument) that creates a genuine dispute of material fact. *See Harrell*, 2022 WL 898565, at *20 ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contentions[.]" (emphasis in original)); *See also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: *citing to particular parts of materials in the record*, including depositions, documents, electronically stored information . . . [.]" (emphasis

added)). We note, too, that Lucas never even addresses the undisputed fact that, "[d]uring his tenure, Chief Sims has promoted five women, three of whom are white: Rachel Saunders (white female), Gina Gallina (Hispanic female); Brittany Brown (white female); Rachel Van Ness (white female), and Daniela Quinn (black female)." City's SOF ¶ 83; *see also* Lucas's Response SOF ¶ 83 ("Not disputed[.]").

Nor does Lucas ever show that the City's "justification is pretextual." "A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis*, 934 F.3d at 1186. We know why the City issued Lucas a written reprimand—and it had nothing to do with her sex. Although Lucas had worked for the City for "approximately 16 years," City's SOF ¶ 2; *see also* Lucas's Response SOF ¶ 2 ("Admitted."), she never suggests that the City *ever* reprimanded her—despite the fact that she was indisputably a woman that whole time—until she published her Facebook post. As Lucas seems to concede, in other words, the City issued her the written reprimand *because* of that post. *See* City's SOF ¶ 59 ("The written reprimand was the only discipline the City imposed upon Lucas based on the Facebook post."); *see also* Lucas's Response SOF ¶ 59 ("See response to ¶ 56, which Ms. Lucas adopts in response to this paragraph.").[29] And *all of the evidence* in our case supports the City's (and Lucas's) position that the City reprimanded her *because of* the post. *See* City' SOF ¶ 18 ("Upon seeing Lucas'[s] Facebook post, Sims concluded it

---

[29] But paragraph 56 only reiterates our point: "Not disputed," Lucas says there, "but not relevant to summary judgment other than to establish that Chief Sims issued Ms. Lucas a written warning because of her private Facebook post[.]" Lucas's Response SOF ¶ 56 (emphasis in original); *see also* Lucas's MSJ at 2 ("[T]he *content of that post* is why Javaro A. Sims . . . subjected her to an Internal Affairs investigation, *which led to a written reprimand*[.]" (emphases added)).

likely violated one or more Department policies." (first citing Sims Decl. ¶ 9; and then citing Sims Dep. at 40:21–41:3)); *see also* Lucas's Response SOF ¶ 18 ("Not disputed[.]"); City's SOF ¶ 55 ("Chief Sims concurred with the finding that Lucas violated R&R # 30 – Professional Conduct. . . . Chief Sims believed that a statement like Lucas'[s] post could hinder the police department's attempts to 'achieve legitimacy through collaboration, transparency and accountability.'" (quoting Sims. Dep. at 152:1–7)); *see also* Lucas's Response SOF ¶ 55 ("Not disputed[.]").

Far from "casting sufficient doubt on the defendant's proffered nondiscriminatory reasons," showing "that the employer's articulated reason is false," or "establishing that the employer has failed to clearly articulate and follow its formal policies," Lucas has only corroborated the veracity of the City's non-discriminatory justification. Indeed, Lucas never bothers to contest the City's argument that its "primary motivation was to protect the public perception of the police department, to prevent community mistrust in the City's policing, and to ensure the effective and efficient function of its police officers." City's MSJ at 20. Lucas has thus forfeited any argument she could've made to the effect that the City's proffered justification is pretextual. *See Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

\* \* \*

Because Lucas doesn't offer direct or circumstantial evidence of sex discrimination, we **GRANT** the City's MSJ as to Count II.

\* \* \*

After careful review, therefore, we hereby **ORDER AND ADJUDGE** as follows:

1. The City of Delray Beach's Motion for Summary Judgment [ECF No. 97] is **GRANTED**.

2.  Nicole Lucas's Motion for Partial Summary Judgment [ECF No. 96] is **DENIED**.

3.  Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

**DONE AND ORDERED** in the Southern District of Florida on September 14, 2023.

 

 

 

 

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record